**IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| MARGO POLETT AND DANIEL POLETT, | : No. 18 EAP 2014 |
| | : |
| Appellants | : Appeal from the Judgment of the Superior |
| | : Court entered on December 20, 2013 at |
| | : No. 1865 EDA 2011 vacating and |
| v. | : remanding the Judgment entered on June |
| | : 10, 2011 in the Court of Common Pleas of |
| | : Philadelphia County, Civil Division, at No. |
| PUBLIC COMMUNICATIONS, INC., | : 02637, August Term 2008 |
| ZIMMER, INC., ZIMMER USA, INC., AND | : |
| ZIMMER HOLDINGS, INC., | : ARGUED:  October 8, 2014 |
| | : |
| Appellees | : |

**OPINION**

**MADAME JUSTICE TODD**                    **DECIDED:  October 27, 2015**

Appellants Margo and Daniel Polett appeal from an order of the Superior Court vacating a judgment for injuries sustained by Margo Polett after she underwent knee replacement surgery during which she received an artificial knee manufactured by Appellee Zimmer, Inc., and, thereafter, appeared in a promotional video produced and filmed by co-Appellee Public Communications, Inc. ("PCI").  Upon review, we reverse the order of the Superior Court and remand to that tribunal to consider the question of whether the trial court erred in refusing to remit the jury's compensatory damage award.

**I.  Facts and Procedural History**

In May 2006, Mrs. Margo Polett, who was then 67 years of age and actively involved in a variety of charitable and civic activities in the Philadelphia community, engaged the professional services of Dr. Robert Booth — a board-certified orthopedic

surgeon — for the purpose of having him perform knee replacement surgery on her right knee because of damage to it caused by rheumatoid arthritis, a degenerative inflammatory disease she suffered from for many years, and which had previously damaged her left knee to the degree that it had to be replaced, with a conventional artificial knee, in 2003.  N.T Trial, 11/15/10 (A.M.), at 113-15, 11/15/10 (P.M.), at 59.  In addition to his surgical practice, Dr. Booth had been working with Zimmer since the mid-1990's in the capacity of a professional consultant, which involved Dr. Booth developing implantable prosthetic medical devices for sale by Zimmer.  N.T. Trial, 11/15/10 (A.M.), at 110-11.  One of these devices Dr. Booth had developed while working with Zimmer was the "Gender Solutions Knee" which he had designed specifically for women, due to his professional experience that, although females comprised the majority of knee replacement patients, the availability of prosthetic devices specifically tailored to female knee structure was limited.  Id. at 80.  Dr. Booth recommended to Mrs. Polett that she undergo surgery to replace her right knee using the Gender Solutions Knee and to also simultaneously replace her previously implanted prosthetic left knee which had deteriorated.  Id. at 114.  Desirous of alleviating her pain and difficulty in walking, Mrs. Polett agreed to this course of action, and, on June 27, 2006, Dr. Booth performed the double knee replacement surgery.  Id. at 118.  There were no complications from the surgery, and, thereafter, Mrs. Polett engaged in a prescribed program of physical therapy beginning in July 2006.  N.T. Trial, 11/15/10 (P.M.), at 69-70.

By August 2006, Mrs. Polett's recovery had advanced to the point that, during an examination on August 16, 2006, Dr. Booth observed that Mrs. Polett was making "better than the average" progress, and he noted then that both of Mrs. Polett's prosthetic knees were affixed and aligned properly, she could extend both legs up to 125 degrees, and her pain level was diminishing.  N.T. Trial, 11/15/10 (A.M.), at 123.  At

that time, Mrs. Polett expressed her happiness to Dr. Booth with the overall results of the procedure. Id.

Previously, in August 2006, the Global Director of Marketing Communications for Zimmer, Lola Yoder, contacted Dr. Booth's office and asked him to identify three of his female patients who had successfully undergone replacement surgery using the Gender Solutions Knee, for the purpose of having them appear in an educational promotional video which would be produced by PCI. As described by Yoder in an email to a member of Dr. Booth's staff, the completed video was to feature the women providing testimonials of how the surgery had positively improved their lives, as well as showing the women participating in physical activities they had "resumed since surgery." N.T. Trial, 11/17/10 (A.M.), at 59; Email, 8/7/06 (Defendant's Trial Exhibit 80). After his observation of Mrs. Polett's favorable post-surgical improvement during his examination on August 16, Dr. Booth provided Zimmer with Mrs. Polett's name as a prospective candidate to appear in the video. N.T. Trial, 11/15/10 (A.M.), at 125; 11/15/10 (P.M.), at 78.

A representative of PCI, Cheryl terHorst, contacted Mrs. Polett shortly after her August 16th visit with Dr. Booth, interviewed her by phone, and arranged for the video to be recorded on August 23, 2006. N.T. Trial, 11/16/10 (A.M.), at 48, 51, 53. On the morning of August 23rd, terHorst and Yoder went to Pennsylvania Hospital ("Penn") where Dr. Booth's offices were located, accompanied by Marcel Franck, a videographer from New City Productions ("New City"), as well as by members of the crew of a film production company Video Tracks Productions ("Video Tracks"), and the taping of the video commenced. N.T. Trial, 11/16/10 (P.M.), at 53.

Mrs. Polett was first filmed in Dr. Booth's office being examined by him. Dr. Booth remarked during this videotaped examination that Mrs. Polett was bearing weight

evenly on both knees, walking without assistance, and that, overall, she was doing "exceptionally well." N.T. Trial, 11/15/10 (A.M.), 127-29. After this portion of the video shoot was completed, terHorst and Yoder met with Mrs. Polett in Dr. Booth's conference room to interview her. N.T. Trial, 11/16/10 (P.M.), at 58. According to Mrs. Polett, it was during this discussion she first learned that she would be filmed while walking on a treadmill and riding a stationary exercise bicycle. N.T. Trial, 11/17/10 (P.M.) at 11. Mrs. Polett was somewhat concerned about riding the bicycle as, by her recollection, she had not ridden a bicycle for over ten years previously. Id. She informed terHorst and Yoder during their conversation that she had not ridden a bike at any time since her surgery. N.T. Trial, 11/17/10 (A.M.), at 9, 40-41, 86-87. Nevertheless, later in the day, Mrs. Polett was taken by terHorst and Yoder to an exercise room in the hospital where she was shown the treadmill and stationary bicycle and asked if she would be comfortable using them. N.T. Trial, 11/16/10 (A.M.), at 65-66; 11/17/10 (A.M.), at 44-50. Based on her assumption that terHorst and Yoder had consulted with Dr. Booth, and, thus, that it was okay for her to perform both physical activities, Mrs. Polett allowed herself to be filmed while walking on the treadmill and then riding the exercise bike.[1] N.T. Trial, 11/17/10 (P.M.), at 11-12. Although Dr. Booth remained at his offices during the entire time period of the shooting of the video, and was available for consultation, neither terHorst nor Yoder ever spoke with him about whether Mrs. Polett was medically cleared to walk on the treadmill or to ride the exercise bicycle. N.T. Trial, 11/15/10 (A.M.), at 126-27; N.T. Trial, 11/16/10 (A.M.), at 59-63.

---

[1] The record does not reflect the exact amount of time Mrs. Polett spent on the bicycle. Although there are three minutes of recorded video footage of her riding the bicycle, terHorst testified that there were multiple breaks in the filming process and, thus, Mrs. Polett spent an indeterminate amount of time on the bicycle during the video shoot which was not recorded. N.T. Trial, 11/16/10 (A.M.), at 97-116.

Mrs. Polett recalled that, after the filming was completed, she felt discomfort and pain while she was driving home in her car. N.T. Trial, 11/17/10 (P.M.), at 13. She felt so poorly that she went immediately to bed and began to feel that "something horrible had happened" during the filming. Id. When her husband arrived home later that evening, she complained to him that "[m]y knees really hurt," and he gave her a bag of frozen peas to apply to her knees to ease the discomfort. N.T. Trial, 11/17/10 (A.M.), at 94-5. The next morning, August 24, 2006, Mrs. Polett awoke, still in pain. Id. at 95. Later that same day, she informed another of her treating physicians, Dr. Herbert Lustig, that she was very sore after having done the promotional video the preceding day. Trial Court Opinion, 6/10/11, at 5.

Thereafter, for three months following the filming of the video, Mrs. Polett suffered such physical discomfort and pain in her knees that she repeatedly complained of it during visits to her rheumatologist and physical therapists. Id. at 5-7. The pain was so bad in both of her knees that, during an appointment with her rheumatologist in October 2006, she rated it as being 10 on a scale of 1-10, and she attributed the cause of the pain to the exercise she did while filming the video. Id. at 53. She also related to her physical therapists that she was having difficulty moving from a sitting to a standing position, and experiencing weakness in her lower extremities.

Mrs. Polett also continued to see Dr. Booth during this three-month period, and she relayed similar complaints to him which indicated a progressive deterioration in the condition of her knees. During Mrs. Polett's visit with Dr. Booth on September 20, 2006 — her first visit to him after the filming of the video — he noted that she had "mild discomfort in her knees after riding on a bicycle," a "[s]light loss of motion from her prior visit," and "[m]ild synovitis" of the knee, which is a condition in which the synovial membrane surrounding the knee joint is inflamed. Id. at 6; PDR Medical Dictionary (2d.

Ed.) at 1773 (2000). By the time of Mrs. Polett's next office consultation with Dr. Booth on October 23, 2006, he observed that she was experiencing "persistent discomfort in both knees" which dated from the time of the exercise video, and that her range of motion had diminished since the time of the preceding visit. Trial Court Opinion, 6/10/11, at 24; Dr. Booth Treatment Note, 10/23/06 (Plaintiff's Trial Exhibit 4). As further recounted in this treatment note, Dr. Booth changed Mrs. Polett's anti-inflammatory medication and had her concentrate on doing hamstring stretches, and reminded her to avoid using weights and doing resistive exercises. Trial Court Opinion, 6/10/11, at 25; Dr. Booth Treatment Note, 10/23/06. Dr. Booth also noted that Mrs. Polett had returned from a trip to Vietnam,[2] which was stressful, and that he remained hopeful that Mrs. Polett's symptoms would diminish. Id.

Subsequent to her October 23rd visit to Dr. Booth's office, Mrs. Polett's condition worsened, and the tendons around the patella (kneecap) of her right leg pulled apart causing her to, on occasion, lose her balance and fall. Trial Court Opinion, 6/10/11, at 53. During one of these falls, she fractured her right kneecap, and, as a result, when Mrs. Polett saw Dr. Booth on November 22, 2006, she was experiencing acute pain and swelling in that knee. Id.; Dr. Booth Treatment Note, 11/22/06 (Plaintiff's Trial Exhibit 6). Less than a week later, on November 27, 2006, Dr. Booth performed surgery to repair Mrs. Polett's fractured right kneecap and its supporting tendons.

Following that surgery, Mrs. Polett experienced further difficulties with her right knee which necessitated her having to undergo three additional surgeries: the first, in January 2007, was a repair of the extensor tendon around the right knee; the second, in September 2007, was an "allograft" procedure to transplant tendon tissue because the

---

[2] Mrs. Polett recalled that this trip was taken at some point prior to this appointment and that she was in a wheelchair for its duration. N.T. Trial, 11/17/10 (P.M.), at 43.

previously repaired right extensor tendon had ruptured, and to allow Dr. Booth to make further revisions to the transplanted knee joint itself; and the third, in February 2008, was another allograft procedure necessitated because of the death of the first transplanted right extensor tendon. Trial Court Opinion, 6/10/11, at 54.

The cumulative effect of these surgeries left Mrs. Polett "functionally limited" and permanently unable to fully extend her right leg. Id. As a result of her diminished mobility, Mrs. Polett is presently no longer able to participate in activities which she formerly enjoyed, such as organizing and hosting charitable events, swimming, or driving. The loss of extension in her right leg has also forced her to use a motility aid in order to walk, i.e., a "walker," and, even with the use of such an aid, she still experiences falls and remains "in constant fear of falling." Id. at 54-55. Further, before her post-video physical difficulties, Mrs. Polett was able to provide aid and physical comfort to her adopted daughter, who suffered from a post-traumatic stress disorder, whenever her daughter suffered attacks of catatonia. Id. at 56. At the time of trial, she was no longer capable of rendering such support, and, instead, her daughter was required to regularly assist Mrs. Polett with routine life activities such as getting into bed. Id. Mrs. Polett remained in constant pain. Id.

During 2008, Mrs. Polett continued to be treated by Dr. Booth. On June 4, 2008, Dr. Booth was asked by the Poletts to sign a "tolling agreement."[3] Dr. Booth memorialized this request in a treatment note that same day, recounting that "[Mr. Polett] says that they are not interested in suing and would never consider it." Dr. Booth Treatment Note, 6/4/08 (Exhibit 6 attached to Defendant's Motion In Limine, 10/28/10). He further stated in the note: "I have explained [to the Poletts] that in my opinion it is the

---

[3] A tolling agreement is an agreement by which the potential defendant agrees to stop the running of time on the potential plaintiff's claim, thereby extending the period of the statute of limitations. Black's Law Dictionary 1495 (9th ed. 1999).

filming company who asked to 'interview' Mrs. Polett with whom the responsibility lies, as well as those who employed them. I do not feel that the hospital or myself has any obligation." Id.

On August 1, 2008, after consulting with his attorney, Dr. Booth signed the tolling agreement. On August 20, 2008, the Poletts filed suit against Appellees, as well as Penn, the University of Pennsylvania Hospital System, New City, Franck, and Video Tracks, and, also, the owner of Video Tracks, Steven Rhykerd, asserting claims for negligence and loss of consortium. On November 12, 2008, New City and Franck, in turn, filed a complaint against Dr. Booth, asserting a cross-claim against him for contribution and indemnity. The Poletts did not sue Dr. Booth.

Throughout 2009, discovery in the case was conducted, and Dr. Booth's deposition was taken on June 26, 2009.[4] In this deposition, Dr. Booth recounted that the inflammation and synovitis he observed in Mrs. Polett's knee during her September 20 and October 23, 2006 office visits were from her riding the exercise bike during the filming of the video, and that this swelling and loss of extension led to Mrs. Polett experiencing her subsequent "cascade" of medical problems. Dr. Booth Deposition, 6/26/09, at 52-53; 60-62.

Thereafter, in 2010, Penn, the University of Pennsylvania Hospital, Video Tracks, and Rhykerd were all dismissed with prejudice as defendants by stipulation, which provided that none of the defendants were negligent in causing Mrs. Polett's injuries. Stipulations to Dismiss, 4/30/10 & 5/12/10. New City and Franck's cross-claim against Dr. Booth was likewise dismissed with prejudice by a stipulation which was executed by counsel for the Poletts and Appellees.[5] In that stipulation, which excepted any claims

---

[4] Counsel for Appellees attended this deposition and cross-examined Dr. Booth therein.
[5] Appellees mounted a joint defense in the trial court and have filed a joint brief with our Court.

subject to the tolling agreement between Dr. Booth and the Poletts, all counsel of record agreed that Dr. Booth was not negligent in his care of Mrs. Polett and that "nothing [he] did or failed to do caused any of [Mrs. Polett's] injuries." Stipulation, 6/1/10.

The Poletts' remaining claims against Appellees — asserting that they, through their employees, were negligent in having her ride the exercise bike during the filming of the video without first determining whether she was medically cleared to do so — proceeded to a jury trial. Prior to the commencement of that trial, in October 2010, the tolling agreement between the Poletts and Dr. Booth was cancelled by mutual agreement. The Poletts then filed a motion *in limine* to bar Appellees "from introducing or making any reference concerning" the tolling agreement on the basis that, under Pa.R.E. 401, it was irrelevant to the issues in the case, because Dr. Booth was not a party, and, also, because Appellees had stipulated that Dr. Booth did not cause Mrs. Polett's injuries. Motion in Limine, 10/23/10, at 2-3. The Poletts further contended that, even if the tolling agreement was relevant, under Pa.R.E. 403, it should, nevertheless, be excluded due to its potential to mislead or confuse the jury. Id. at 3-4. Additionally, the Poletts argued that, if the agreement were admitted, supplemental testimony would potentially be needed from their trial counsel in order to explain to the jury the process of the tolling agreement's formation, its terms, and its functioning, which, according to the Poletts, may have required trial counsel to testify regarding information protected by the attorney-client privilege. N.T. Trial, 11/15/10 (A.M.), at 30.

Appellees opposed the motion on the basis that the tolling agreement was, in their view, relevant to show potential bias on the part of Dr. Booth at the time he gave his deposition on June 26, 2009, in which he opined that the bicycle ride was the cause of her synovitis and inflammation which led to her subsequent kneecap fracture and falls, inasmuch as the agreement was in effect at that time. Appellees asserted that the

probative value of the agreement as impeachment evidence outweighed the agreement's potential to mislead or confuse the jury. N.T. Trial, 11/15/10 (A.M.), at 19-20.

After entertaining argument from the parties prior to trial, the trial court — the Honorable Frederica Massiah-Jackson — entered an order granting the Poletts' motion without elaboration. See Order, 11/15/10. The trial court, in orally announcing its pretrial ruling after the parties' argument, and in its opinion prepared pursuant to Pa.R.A.P. 1925(b), did not specifically address whether it was excluding the tolling agreement under either Pa.R.E. 401 or 403; however, in its opinion, the court observed that Dr. Booth wrote office notes two years before the existence of the tolling agreement describing the pain Mrs. Polett suffered after the riding of the exercise bicycle in the video, and, thus, in the trial court's view, the existence of the agreement could not have influenced his opinions. Further, the trial court noted that Appellees expressly stipulated that Dr. Booth was not negligent, that Appellees' expert — Dr. Charles R. Clark, an orthopedic surgeon and professor of biomedical engineering at the University of Iowa — opined that the bicycle ride had been one of the causes of her synovitis, and that Dr. Booth did not place responsibility on Appellees for causing Mrs. Polett's injuries. N.T., 11/15/10 (A.M.), at 33; Trial Court Opinion, 6/10/11, at 31-32.

Appellees also filed a motion *in limine* to preclude Dr. Booth from testifying as an expert at trial under Pa.R.Civ.P. 4003.5, due to the fact that he did not prepare an expert witness report in accordance with the requirements of that rule. The trial court denied the motion on the grounds that Dr. Booth was not a witness who was retained in anticipation of litigation; rather, in the court's view, Dr. Booth formed his opinions as to causation, about which he would be testifying at trial, during the course of his treatment relationship with Mrs. Polett, as evidenced by his treatment notes of September 20,

2006 and October 23, 2006. The trial court observed that Dr. Booth, in those treatment notes, remarked on her knee infection and inflammation which dated from the time of the bike ride. Trial Court Opinion, 6/10/11, at 22, 24. Further, the trial court noted that Dr. Booth had been deposed by Appellees nearly a year and a half before trial, his treatment notes had been made available for review by Dr. Clark, and Dr. Booth was not going to be offering an opinion at trial on the issue of negligence. Id. at 22.

A jury trial commenced on November 15, 2010. Regarding the issue of causation, which is central to the questions presented by this appeal, the jury heard testimony from Dr. Booth in which he opined that Mrs. Polett's riding of the exercise bike for the video shot on August 23, 2006 was a substantial factor in beginning a chain of linked events that ultimately caused her harm. Dr. Booth opined that the bicycle ride was the "only factor" he was aware of that caused the synovitis in her transplanted knee. N.T. Trial, 11/15/10 (P.M.), at 19. He explained that this inflammation, in turn, led to Mrs. Polett having a reduced ability to extend her leg, and it was a substantial factor in causing the separation of the tendons surrounding her kneecap. This diminished range of leg motion and weakness of the supporting tendons resulted in the fracture of her kneecap and led to her falls. Id. at 19-21. Ultimately, according to Dr. Booth, this directly linked sequence of events, stemming from the initial synovitis, was a substantial factor in causing Mrs. Polett to be forced to undergo the four subsequent surgeries which she endured. Id. at 23-24. Dr. Booth rejected the notion that any other activities Mrs. Polett engaged in after the replacement surgery, like walking on the beach or her travel to various foreign and domestic destinations such as Vietnam and New York City, could have caused her post-operative medical problems. Id. at 30-31. Dr. Booth expressed the opinion that the bicycle ride was, for Mrs. Polett, a "watershed" moment in her treatment, and that, absent that event, it was likely that she would have been

among the 98 percent of his patients whose knee replacement operations were successful, i.e., having only minor pain, good range of motion, and no need for the prosthetic implants to be replaced. Id. at 33, 35.

Appellees presented their own evidence on the issue of causation, through Dr. Clark's videotaped deposition, in which he agreed that Mrs. Polett's bicycle ride for the exercise video was a factor in causing her to suffer the synovitis. Trial Court Opinion, 6/10/11, at 29. However, Dr. Clark also expressed the view that several other causative factors also contributed to Mrs. Polett developing synovitis: the natural inflammatory response of the body to major surgery; her pre-existing rheumatoid arthritis; her inability to take certain anti-inflammatory drugs due to liver toxicity; her travel to foreign and domestic destinations; her walking in sand along a beach; and her performance of leg presses with weights during physical therapy sessions before and after the date of the filming. Id. at 19, 45; Dr. Clark Deposition, 11/12/10, at 14-15, 20.

On the morning of November 18, 2010, as the jury was watching Dr. Clark's video deposition, the trial court conferred with counsel for both parties in chambers regarding proposed jury instructions. During this conference, the Poletts' counsel stated he wished to prohibit opposing counsel from arguing to the jury that activities or incidents other than Mrs. Polett's riding of the exercise bike caused her injury, if there was no medical testimony to support such an assertion. N.T. Trial, 11/18/10 (A.M.), at 45-46. Pennsylvania counsel for Appellees, William Conroy, Esquire, agreed that some charge regarding speculation should be given, and he indicated that he was amenable to a general instruction to the jury that they were not permitted to speculate as to any fact. Id. at 45. The trial court stated that she would defer ruling on whether any instruction was needed on this issue until after both sides delivered their closing arguments. Id. at 50-51. Later that morning, the trial court gave the jury its instructions.

During the afternoon of November 18, 2010, the parties presented their closing arguments. Counsel for Appellees, Kurt Stitcher, Esquire, who was from Chicago and who does not seem, from the record, to have been present at that morning's charging conference, presented argument to the jury regarding the issue of causation of Mrs. Polett's injuries. Relevant to the current appeal, counsel argued the following points: between Mrs. Polett's filming of the video in August 2006, and her surgery in November 2006, she kept only 8 out of her 42 prescribed physical therapy visits; allegedly threw out documents from Dr. Booth describing activities she was permitted to engage in; and did not check with Dr. Booth, prior to engaging in planned activities, as to whether such activities were allowed. N.T. Trial, 11/18/10 (P.M.), at 84-85, 99-100.

Attorney Stitcher further argued that the cause of Mrs. Polett's problems after Dr. Booth's November 2006 surgery was her failure to wear a knee brace properly in order to lock her leg into full extension, sleeping without the brace, not wearing the brace while attending church services during which she felt a painful "pop" in her knee, not calling Dr. Booth immediately after she felt the knee pop, and taking a trip to New York City during which she did not use a cane or walker. Id. at 85-87.

Mrs. Polett's counsel raised an immediate objection to each of these arguments, which the trial court sustained. After Attorney Stitcher had finished his argument, the trial court noted her assumption that Attorney Conroy had warned Attorney Stitcher that she would consider giving the charge requested by Mrs. Polett's counsel if closing arguments revealed a need for it, and that Attorney Stitcher had apparently ignored that warning. Id. at 104-05. The trial court then gave the following supplemental instruction to the jury, which was substantially the same instruction counsel for the Poletts had previously requested during the charging conference:

> Ladies and gentlemen, we're getting ready to hear the response or rebuttal closing argument by [the Poletts' counsel] Mr. Specter.
>
> And I wanted to alert you and just add to my earlier instruction that in order for you to find that something other than the exercise bike caused Mrs. Polett's injuries, you must be provided with medical testimony that something else other than the bike caused those injuries. You may not speculate on what else could have caused Mrs. Polett to be injured.

Id. at 105.

Once counsel for the Poletts had given his rebuttal argument, the jury retired to deliberate. When the jury left the room, Attorney Conroy objected to the supplemental jury instruction on the grounds that, in his view, it had the effect of shifting the burden of proof from the plaintiff to the defendant. Id. at 123. The trial court noted the objection. Id.

After deliberation, the jury returned a verdict for Mrs. Polett in the amount of $26.6 million. The jury found Zimmer and PCI 34% and 36% negligent, respectively, for causing Mrs. Polett's injuries. Because the jury also determined Mrs. Polett was 30% comparatively negligent, the trial court reduced her share of the jury verdict by that proportion. Ultimately, after computing delay damages, the trial court entered judgment in favor of Mrs. Polett in the amount of $19,602,141.23 on her negligence claims, and in favor of Mr. Polett on his loss of consortium claim in the amount of $700,000.

Once their post-trial motions were denied, Appellees took a direct appeal to the Superior Court raising six issues — three of which a majority of an *en banc* panel of the Superior Court found meritorious in a published opinion. Polett v. Public Communications, 83 A.3d 205 (Pa. Super. 2013).[6] Specifically, the Superior Court

---

[6] The *en banc* majority opinion was written by Judge Shogan and joined by President Judge Bender, and Judges Bowes, Gantman, and Olson. Judges Donohue and (continued…)

majority concluded the trial court erred: in granting the Poletts' motion *in limine* to bar Appellees from using the tolling agreement between Dr. Booth and the Poletts to impeach his trial testimony; in permitting Dr. Booth to testify as an expert witness when he was not identified as an expert witness prior to trial — as required by Pa.R.Civ.P. 4003.5 — and by giving its supplemental jury charge admonishing the jury against speculation as to the cause of Mrs. Polett's injuries.[7] Based on these rulings of trial court error, the Superior Court vacated the judgment and granted Appellees a new trial.

With respect to the trial court's preclusion of Appellees' use of the tolling agreement as impeachment evidence against Dr. Booth, the Superior Court majority observed that, as a general matter, pursuant to Pa.R.E. 607(b), the credibility of a witness may be impeached by any relevant evidence. As to whether the tolling agreement constituted such relevant impeachment evidence, the majority acknowledged that the courts of our Commonwealth have not specifically opined on the question of whether such an agreement may be used for impeachment purposes. The court noted, however, that, analogously, certain types of indemnification agreements between a plaintiff and one of multiple co-defendants, as well as compensation agreements between a party and its expert witness, have both been deemed admissible by Pennsylvania courts as relevant impeachment evidence to show the bias of testifying witnesses. Polett, 83 A.3d at 224-25 (citing Hatfield v. Continental Imports, 610 A.2d

---

(…continued)
Lazarus concurred in the result. Judge Wecht, joined by President Judge Emeritus Kate Ford Elliott, dissented.

[7] The majority rejected Appellees' claims that they were entitled to judgment notwithstanding the verdict based on insufficient evidence showing the bicycle ride caused Mrs. Polett's injuries, or that Appellees breached their duty not to subject her to an unreasonable risk of harm. However, in light of its disposition vacating the judgment and remanding for a new trial, the majority did not consider Appellees' challenge to the trial court's denial of their motion for remittitur.

446 (Pa. 1992) (settlement agreement between one of multiple co-defendants and the plaintiff was relevant to show bias of settling defendant's witnesses in favor of plaintiff, due to the fact that, because of the agreement, defendant stood to financially benefit in the event of a larger plaintiff's verdict against co-defendant); Coward v. Owens-Corning, 729 A.2d 614 (Pa. Super. 1999) (holding that trial court did not abuse its discretion in allowing plaintiff to cross-examine defendant's expert witness on the amount of fees he received to give testimony on behalf of asbestos defendants and whether his opinions in the case in which he testified were affected by that compensation)).  Further, the majority found guidance from an unpublished opinion of a federal magistrate judge for the District Court of New Jersey, AMEC Civil, LLC v. DMJM Harris, Inc., 2008 WL 8171059 *2 (Dist. Ct. N.J. 2008), in which that judge found that, because "settlement or tolling agreements can be used as impeachment evidence," tolling provisions of a joint defense agreement between multiple defendants were discoverable in a civil trial.

The majority reasoned that, "[t]he issue of causation was determinative of Mrs. Polett's case.  Dr. Booth's testimony on causation and on what influenced his opinions was, therefore, relevant." Polett, 83 A.3d at 225.  The majority found that Dr. Booth first opined that the exercise bike ride was the cause of Mrs. Polett's injuries during his deposition, which was taken *after* he was approached by the Poletts to sign the tolling agreement.  In that deposition, he placed the blame on PCI and its employees who arranged the ride, and he stated that he wanted to continue to treat Mrs. Polett without the threat of litigation.  Consequently, in the majority's view, Appellees should have been permitted to explore whether the tolling agreement resulted in partiality on the part of Dr. Booth in rendering his causation opinion.

The majority also deemed the probative value of the tolling agreement to outweigh its potential for prejudice under Pa.R.E. 403.  In the majority's view, if Dr.

Booth was questioned at trial about the tolling agreement, he would have been free to explain that he was not sued by the Poletts, that all parties stipulated that he was not responsible for Mrs. Polett's injuries, that the agreement was not in effect at the time of trial, and that the agreement did not have any effect on his opinions; hence, the jury would have been able to "fully assess the quality of Dr. Booth's testimony." Id. at 226.

Concerning the trial court's denial of Appellees' motion *in limine* to preclude Dr. Booth from testifying as an expert witness, the majority determined that, pursuant to Pa.R.Civ.P. 4003.5, the trial court should not have permitted Dr. Booth to provide expert testimony, as he was not disclosed as an expert witness by the Poletts, nor did he prepare an expert report. The court determined that Dr. Booth's treatment notes written during September and October of 2006 were not causation opinions which Dr. Booth had developed during his course of treating Mrs. Polett, as the trial court found. Instead, the majority considered them to merely establish "a temporal connection between Mrs. Polett riding the exercise bike and her injuries." Polett, 83 A.3d at 220. The court viewed Dr. Booth's June 4, 2008 treatment note, in which he recounted his opinion that the bicycle ride had caused Mrs. Polett's injury, as evidence that he "contemporaneously associated Mrs. Polett's injuries with the exercise bike and faced the possibility of litigation." Id. Thus, the majority concluded that Dr. Booth's opinion that Mrs. Polett's riding of the bicycle caused her injuries did not arise during the regular course of Dr. Booth's treatment relationship with Mrs. Polett, but, rather, was an opinion which "arose under a sword of litigation." Id. at 221 (citing Kurian v. Anisman, 851 A.2d 152 (Pa.Super. 2004) (exclusion of expert testimony of plaintiff's treating physician under Pa.R.Civ.P. 4003.5 as to whether defendant doctor's treatment of patient breached the standard of care and caused plaintiff's injuries was proper, as these opinions were developed for the purpose of litigation)).

The majority further found that the Poletts' failure to properly designate Dr. Booth as an expert resulted in prejudice to Appellees because Dr. Booth did not prepare an expert report, or provide answers to interrogatories as required by Pa.R.Civ.P. 4003.5(a)(1)(b), which, in the majority's view, would have revealed the basis for his causation opinion and thereby allowed Appellees to contest it at trial. The majority accepted Appellees' argument that Dr. Booth's June 26, 2009 deposition did not cure this prejudice, since, when Dr. Booth gave that deposition, Appellees lacked notice that he would be testifying as an expert, and, thus, they deposed him as a fact witness.

Lastly, the majority concluded that, because the trial court's supplemental charge to the jury — cautioning them that there needed to be medical testimony that something other than the bicycle ride caused Mrs. Polett's injuries and forbidding them from speculating as to other causes — was isolated from the rest of the jury charge, it had the effect of "improperly focus[ing] the jury's attention on the idea that [Appellees] were required to do more than prove Mrs. Polett's comparative negligence." Polett, 83 A.3d at 217. In the majority's view, the supplemental charge had the effect of shifting the burden of proving negligence to the defendant since it "palpably misled the jury into believing that [Appellees] were required to present medical evidence that something other than the exercise bike caused Mrs. Polett's injury." Id. at 218. The majority considered Appellees' evidence of Mrs. Polett's medical history and her post-operative activities not to have been a speculative attempt to link Mrs. Polett's injuries to another cause, but, instead, merely an effort by Appellees to "demonstrate[e] her comparative negligence and undermin[e] her credibility." Id.

Judge David Wecht authored a comprehensive dissent to the majority's disposition of each of these three issues. Regarding the majority's conclusion that the trial court abused its discretion by barring the tolling agreement from being introduced

as impeachment evidence, the dissent disputed the majority's conclusions that the agreement had probative value, and that the jury would not be confused or misled by its admission. With respect to the question of relevance, the dissent opined that the agreement had little probative value as it had been cancelled prior to the start of trial and the parties had stipulated that Dr. Booth was not negligent. Concerning the potential for the agreement to confuse or mislead the jury, the dissent considered that prospect to be significant, and that its admission would likely create a serious disruptive impact on the trial process:

> [T]he tolling agreement had obvious and patent potential to confuse or mislead the jury. It can hardly be gainsaid that tolling agreements lie outside the realm of an average lay juror's knowledge. Testimony would have to be introduced, almost certainly by an expert witness, to explain what a tolling agreement is and what its purpose would be in this case. There would be manifest danger that such testimony would invade areas protected by attorney-client privilege, as litigation strategy necessarily would come into play. Issues presumably discussed between Appellees and their counsel, such as whom to sue and when to initiate litigation, as well as the reasons for later dissolving the tolling agreement, would have to be excavated, aired, and examined thoroughly so that the jury might be able fully to evaluate the extent to which the agreement might have influenced Dr. Booth's testimony. Perhaps Appellees' counsel would have to be disqualified and new counsel retained. At the least, the case would have been lengthened substantially, and the jury would have been treated to the proverbial trial within a trial.

Polett, 83 A.3d at 233-34 (Wecht, J., dissenting).

As to the question of whether the trial court abused its discretion by allowing Dr. Booth to testify as an expert, the dissent found that the resolution of that question turned on the point in time at which Dr. Booth formed his opinion as to the cause of Mrs. Polett's injuries. In the dissent's view, Dr. Booth did reach an opinion as to causation before the prospect of litigation had surfaced, as evidenced by his September 20, and

October 23, 2006 treatment notes, as well as his June 26, 2009 deposition testimony. The dissent pointed out that, in his deposition, Dr. Booth identified the bike ride as the cause of the swelling and inflammation in Mrs. Polett's knees as of the time of her September 20, 2006 office visit, and, indicated that, when he wrote his treatment note on October 23, 2006, after Mrs. Polett's office visit that day, he was of the opinion that the bicycle ride had caused her synovitis, which, in turn, started the chain of events that led to her ultimate injuries. The dissent noted that Dr. Booth's trial testimony was consistent with this deposition testimony, and that, at trial, Dr. Booth again averred that he formed his opinion that the bicycle ride caused Mrs. Polett's synovitis at the time he wrote his October 23, 2006 treatment note, and denied that his opinion was formed in anticipation of litigation. The dissent additionally highlighted the fact that Dr. Booth testified at trial that, while he was treating Mrs. Polett in the fall of 2006, he was concerned about the cause of her injury, as, for him, it was determinative of whether the inflammation and pain she was experiencing was caused by an infection, or, alternatively, if it was mechanical in origin.

Also, the dissent observed that the purpose of Pa.R.Civ.P. 4003.5 was to prevent surprise to a party at trial, and the dissent discerned no prejudicial surprise to Appellees from the trial court's decision to allow Dr. Booth to testify as an expert. The dissent pointed out that Appellees participated in Dr. Booth's deposition, and that his testimony at trial and in his deposition was consistent.

Lastly, regarding the trial court's supplemental jury instruction, the dissent emphasized that the trial court instructed the jury in its main charge that the Poletts had the burden of proof to establish, by a preponderance of the evidence, that Appellees were negligent, and that their negligence was the cause of Mrs. Polett's injury. Consistent with the well-established principle that a jury charge must be considered in

its entirety, and portions thereof not examined in isolation, the dissent viewed the trial court's short supplemental instruction about speculation as providing an accurate statement of the law which, when viewed in the context of the original charge, did not shift the burden of proof to Appellees. Further, the dissent underscored the nature of Appellees' closing argument was such that it did more than simply challenge the adequacy of the Poletts' evidence regarding causation; rather, it propounded alternative theories of causation for Mrs. Polett's injuries, and the trial court's instruction properly reminded the jury that such theories must be based on trial evidence and not just speculation.

The Poletts subsequently sought allowance of appeal from our Court of the Superior Court decision, which we granted on the following issues:

> [I]. Did the trial court act within its discretion by precluding from evidence an expired tolling agreement between [the Poletts] and Dr. Booth, where the trial court had substantial grounds for preclusion, including that admission of the agreement would cause confusion and delay, and where [Appellees] had other means to attempt impeaching the credibility of Dr. Booth as a witness on [the Poletts'] behalf?
>
> [II]. Did the trial court act within its discretion by allowing Dr. Booth to give expert testimony on causation where Dr. Booth reached his causation opinion during the course of treating [Appellant Margo Polett] and before litigation was anticipated?
>
> [III]. Did the trial court act within its discretion by instructing the jury not to speculate about alternative causes of [Appellant Margo Polett's] injuries where[:] (a) during closing argument, [Appellees'] counsel speculated about [Appellant Margo Polett's] injuries after promising the trial court it would not speculate; (b) the trial court's no-speculation instruction incorporated prior causation instructions that squarely placed the burden of proof on [the Poletts]; and (c) the no-

speculation instruction correctly stated Pennsylvania law against speculation?

Polett v. Public Communications, Inc., 91 A.3d 1237 (Pa. 2014).[8]


## II. Analysis

### A. The Trial Court's decision not to admit the tolling agreement between the Poletts and Dr. Booth


In the first issue, we consider whether the Superior Court erred in its ruling that the trial court had abused its discretion by barring the introduction of the tolling agreement as trial evidence. The Poletts first defend the trial court's decision to exclude the tolling agreement as reasonable, and in accord with the discretionary latitude given to it by Pa.R.E. 403, which permits exclusion of otherwise admissible evidence if the probative value is outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Poletts' Brief at 21 (quoting Pa.R.E. 403). The Poletts minimize the probative value of the tolling agreement, pointing out that Appellees, by stipulating that Dr. Booth bore no responsibility for Mrs. Polett's injuries, "ratified Dr. Booth as a disinterested witness about the events in question," because this stipulation established that he had no incentive to lie either during his deposition or at trial. Poletts' Brief at 21. The Poletts argue that, because of the tolling agreement's minimal probative value, the trial court reasonably exercised its discretion in precluding it, inasmuch as the countervailing reasons to deny its admission articulated by the Poletts at trial were properly given greater weight by the trial court.

---

[8] For purposes of our discussion and analysis, the issues have been reordered.

The Poletts contend that the Superior Court improperly substituted its judgment for the trial court's by relying on AMEC, supra, since that case involved the question of whether a tolling agreement was *discoverable* under the federal rules of civil procedure, not whether it was admissible at trial; thus, it does not establish that the trial court, instantly, abused its discretion in barring the agreement from evidence. Further, the Poletts assert that the Superior Court gave too much weight to Appellees' contention that the preclusion of the tolling agreement interfered with Appellees' ability to highlight for the jury any bias Dr. Booth may have possessed. The Poletts observe that Appellees had the opportunity to ask Dr. Booth, at both his deposition and at trial, whether he was at risk of being sued by the Poletts, without making reference to the tolling agreement. Consequently, according to the Poletts, the trial court's decision to bar the admission of the tolling agreement did not stop Appellees from challenging Dr. Booth's credibility on the basis that he was at risk for suit by the Poletts; rather, it merely prohibited them from using the term "tolling agreement" in the presentation of their case to the jury. Poletts' Brief at 24.

Additionally, the Poletts advance what they consider to be "[s]ignificant policy considerations," which they contend weigh in favor of the trial court's discretionary decision, and against what they consider to be the Superior Court's adoption of a general rule of admissibility for tolling agreements. The Poletts proffer that the Superior Court's decision has the potential to damage the patient-physician relationship any time litigation is contemplated, because it deprives both the patient and his or her physician of the "safe harbor" which a tolling agreement provides. Id. at 24-25. Specifically, the Poletts note that patients have a vitally important interest in maintaining a treatment relationship with their physicians, "because of the crucial role [the] physicians play in [the patient's] ongoing care, [and, in] turn, treating physicians like Dr. Booth have

significant professional and personal interests in continuing to treat their patients even when potential litigation looms." In the Poletts' view, tolling agreements serve to preserve that relationship. Id. The Poletts contend that these mutual physician-patient interests in maintaining an effective treatment relationship are exactly what motivated them to enter into the tolling agreement with Dr. Booth, as they viewed him to be the physician who could best cure Mrs. Polett, and, had they sued him, it would have potentially caused him to quit treating her — thereby depriving her of the greatest chance for successful treatment of her medical condition.

Based on their interpretation of the Superior Court decision as standing for the proposition that tolling agreements are always admissible as impeachment evidence, the Poletts point out that this decision will have a particularly negative impact on physicians. The Poletts develop that, because of this decision, every time physicians now sign a tolling agreement, they must worry that their integrity and competency will be attacked at trial on the basis of that agreement. The Poletts maintain that this prospect will defeat the fundamental purpose of a tolling agreement, which is to preserve the patient-physician relationship, even when the physician may have no connection with forthcoming litigation, or, at most, will be a fact witness in that litigation.

Additionally, the Poletts assert that allowing the admissibility of tolling agreements as impeachment evidence would result in incentives for physicians to be sued. The Poletts highlight the fact that tolling agreements are used by attorneys for many reasons which a jury would not easily understand without an explanation, and that such an explanation, the Poletts aver, "would involve a mini-course in claims, procedural defenses, litigation strategy, and the client's relationship with the potential defendant." Id. at 26. Absent such information being furnished to the jury, the Poletts argue that the tolling agreement would serve as a virtual "scarlet letter" hanging around

a physician's neck since it would suggest to the jury that the physician was at fault and the parties have reached a settlement, or, alternatively, that the party who executed the tolling agreement colluded with the physician with respect to the subject of his or her testimony. Id. at 27. The Poletts suggest that, to avoid this prospect, attorneys would simply file suit against physicians, thereby increasing the number of lawsuits against physicians — which is against our public policy.

The Poletts aver that, by contrast, precluding the admission of tolling agreements also serves the same purpose undergirding the prohibition of the introduction of settlement agreements — facilitating resolution of claims without necessity of resort to a lawsuit. The Poletts note that tolling agreements are even more effective in furthering this purpose since, rather than settling a lawsuit, they prevent one from ever being filed. the Poletts also point out the broad impact of the Superior Court decision on litigation in this Commonwealth since it is applicable to all tolling agreements, not just those executed in the course of medical malpractice litigation.

Appellees respond by arguing that, under Pa.R.E. 607(b), they were entitled to impeach Dr. Booth with any evidence relevant to his credibility. They contend that our Court has permitted cross-examination of witnesses regarding the existence of other agreements, which they characterize as similar in nature to tolling agreements. According to Appellees: in Hatfield, supra, our Court ruled that an indemnification agreement between one of multiple co-defendants and the plaintiff, whereby the co-defendant would be indemnified if the other defendant was held liable, was admissible to show bias; in Blue Stamp v. Urban Redev. Auth. of Pittsburgh, 241 A.2d 116, 118 (Pa. 1968), our Court deemed a reimbursement agreement between a witness and a defendant, and a fee arrangement between a defendant and an expert witness, admissible due to their potential impact on the witness's credibility; and, in Grutski v.

Kline, 43 A.2d 142 (Pa. 1945), our Court held that a fee agreement of a doctor who was testifying as an expert witness was admissible since the compensation the witness was receiving could have affected his credibility.

Appellees proffer that the trial court's decision to bar them from making reference to the tolling agreement contravened the basic tenets of these decisions, as well as the principle articulated in AMEC, supra, that such agreements are relevant to show witness bias. Appellees highlight that Dr. Booth was the Poletts' only expert on the issue of causation and the one who performed the surgeries, which were unsuccessful at resolving her knee problems. Appellees note that Dr. Booth testified at his June 26, 2009 deposition that the prospect of litigation was a "sword hanging over" him, which he found "very polarizing" and that he was "upset" at the time he wrote his June 4, 2008 treatment note, in which he mentioned being presented with the tolling agreement. Appellees Brief at 28 (quoting Dr. Booth Deposition, 6/26/09, at 102, 183-85). Appellees aver that, since it was during his deposition that Dr. Booth "first reached a causation opinion, with a 'sword hanging over' him, the jury [was required to] hear about that litigation 'sword' — here, the Tolling Agreement — to assess [Dr. Booth's] credibility." Appellees' Brief at 28. Thus, in Appellees' view, the Superior Court properly found that the jury was entitled to hear about the tolling agreement to demonstrate Dr. Booth's partiality in placing responsibility for causing Mrs. Polett's injuries on them.

Appellees dispute that the prejudicial impact of the tolling agreement outweighed its probative value and, thus, contend that admission of the agreement was not barred by Pa.R.E. 403. Appellees aver that the stipulation they entered into with Dr. Booth spoke only to the issue of his culpability in causing the injury to Mrs. Polett, not whether his causation testimony was influenced by his fear of the "litigation 'sword'" of the tolling

event. Id. at 29. Appellees point out that nothing in the stipulation barred them from inquiring into the matter of Dr. Booth's bias.

Additionally, Appellees deny that other means to show Dr. Booth's bias such as cross-examination were sufficient since they contend it was the "'sword' of the Tolling Agreement — which memorialized [the Poletts'] threat to sue Dr. Booth — that was the 'polarizing' event." Id. at 30. Appellees contend that, without being able to raise and address the tolling agreement, they were unable to show why Dr. Booth first decided to place responsibility on them almost two years after the incident.

Appellees also argue that the tolling agreement would not have confused or misled the jury since they would merely have explained to the jury what the agreement was — an agreement to extend the time to sue. In Appellees' view, the degree of complexity of an elucidation of this purpose is far less than that involved with explanations of more complicated matters to which juries are routinely exposed. Appellees proffer that tolling agreements are no more complex than indemnification agreements, joint defense agreements, and expert witness fee agreements, all of which juries easily understand. Appellees reject the prospect that privileged matters or matters of litigation strategy would have necessitated exploration at trial; rather, in their view, it was only Dr. Booth's motivations, which required inquiry.

Finally, Appellees refute the Poletts' policy arguments, first arguing that, procedurally, such arguments were waived since the Poletts never raised them before the trial court. On the merits, Appellees assert that the Superior Court decision did not create a blanket rule of admissibility of all tolling agreements; rather, the admissibility of the tolling agreement depended on the unique facts of this particular case. Further, Appellees see scant prospect that a judicial decision which finds that tolling agreements are admissible into evidence will adversely affect the physician-patient relationship,

inasmuch as it is unlikely that it will create any more tension in the physician-patient relationship than the existing threat to sue. Appellees note that physicians have an independent duty of care to their patients which exists regardless of the existence of a tolling agreement, and that, if a patient wants to avoid the consequences of a tolling agreement with his or her physician being admitted into evidence, i.e., termination of the physician-patient relationship, then he or she is free to use an independent medical expert.

Appellees deny that the same policy reasons for prohibiting the admission of settlement agreements into evidence apply to bar the admission of tolling agreements, as tolling agreements are executed well in advance of the final settlement of an action and there is no need for their terms to be kept confidential. Appellees suggest that, if juries are not informed about the existence of tolling agreements, then that would create an incentive to present tolling agreements to a prospective target of litigation to get a favorable causation opinion from that individual, leaving juries unaware that his or her motive for rendering the opinion was to escape being sued.[9]

We review the trial court's decision to bar Appellees' use, at trial, of the tolling agreement between the Poletts and Dr. Booth for impeachment purposes under an abuse of discretion standard. See, e.g., Commonwealth v. Lane, 424 A.2d 1325, 1328 (Pa. 1981). As our Court has often explained:

> An abuse of discretion "may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support

---

[9] The Pennsylvania Association for Justice has filed an *amicus* brief in this matter in which it largely echoes the Poletts' legal and policy arguments against the admission of the tolling agreement as impeachment evidence.

[from the evidence or the record] so as to be clearly erroneous.

Ball v. Bayard Pump & Tank Co., Inc., 67 A.3d 759, 767 (Pa. 2013); Paden v. Baker Concrete Const., 658 A.2d 341, 343 (Pa. 1995). However, "[o]ur review of the Superior Court's assessment of the trial court's discretionary decision . . . is not deferential, but plenary and *de novo*," Commonwealth v. Hoover, 107 A.3d 723, 729 (Pa. 2014), as we stand "in the same position as the Superior Court when reviewing discretionary trial level determinations." Id.[10]

As recognized by the parties and the lower courts, the admissibility of evidence for impeachment purposes is governed by Pa.R.E. 607(b), which provides:

> **(b) Evidence to Impeach a Witness.** The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules.

Pa.R.E. Rule 607(b). Under this rule, all evidence relevant to a witness's credibility is admissible for impeachment purposes, unless its admission is otherwise barred by a statute, or our Rules of Evidence. Hoover, 107 A.3d at 730; Commonwealth v. Carson, 913 A.2d 220, 254-55 (Pa. 2006). Thus, as germane to this case, even though

---

[10] As a preliminary matter, and contrary to the assertion of the Poletts and *amicus*, we do not read the Superior Court's decision as establishing a general rule of admissibility for tolling agreements in all cases; rather, we regard the Superior Court decision to be based on the particular facts of this case. While we acknowledge the policy arguments of the parties and *amicus* for and against the adoption of a general rule, we do not consider it prudent to adopt such a bright line rule, inasmuch as the lower court decisions did not rest on general policy considerations, and the parties did not press such arguments to those tribunals. Rather, the lower courts analyzed the admissibility of the tolling agreement using the general principles governing the admissibility of all impeachment evidence, and, as we explain infra, our Court has utilized these same general principles in determining the admissibility of a partial settlement agreement which tended to show bias on the part of a witness for the signatory. See Hatfield, supra. We, therefore, conduct our review in accordance with those principles.

evidence may be relevant to the impeachment of the credibility of a testifying witness, it may not be used against him or her at trial if it may be excluded under Pa.R.E. 403, which provides:

> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403.

Our Court has, as a general matter, deemed any evidence demonstrating a witness's interest or bias to be admissible for impeachment purposes. Commonwealth v. Birch, 616 A.2d 977, 978 (Pa. 1992). A witness's pecuniary gain directly realized from the act of giving testimony has long been recognized as admissible impeachment evidence since it is well known, as a matter of practical human experience, that a witness's receipt of such a direct financial benefit can influence his or her testimony. Thus, whenever a witness is being paid a fee for his or her testimony, pursuant to an agreement, our Court has held that the jury is entitled to learn of that payment and consider whether it may have affected the substance of the witness's testimony. See Grutski, 43 A.2d at 144 (doctors' witness fees received for their testimony relevant since such fees "could have been such as to affect their credibility as witnesses"), and Blue Stamp, 241 A.2d at 118 (where value of property was central issue in condemnation proceeding, monetary amount of appraisal fee paid to professional testifying on behalf of plaintiff relevant to credibility).

Likewise, there are situations in which a witness who testifies at trial is not paid for his or her testimony, nor is a party to the litigation, but, nevertheless, stands to financially benefit from the trial — either directly from its outcome, or from the outcome's

impact on future litigation in which the witness will be participating. Our Court has recognized that, in such circumstances, because of the potential for the witness to enhance his or her financial interest through his or her trial testimony, the trial court must permit the witness to be cross-examined about this possibility. See, e.g., Blue Stamp, 241 A.2d at 118 (cross-examination at condemnation trial of a corporate officer of tenant of condemned building about bond he paid to reimburse the condemnor/governmental authority in the event that authority had to compensate the condemnee as the result of the trial, "proper as bearing on the witness' credibility"); Commonwealth v. Butler, 601 A.2d 268 (Pa. 1991) (defendant in perjury trial was entitled to cross-examine police detective about the fact that he was the subject of a civil suit filed by the defendant, in which detective could have been found personally liable, since jury could have found bias on the part of the detective due to the fact that the perjury conviction would have reduced defendant's probability of success in the civil action); Birch, 616 A.2d at 978 (defendant in reckless endangerment trial arising from his confrontation with two individuals, one of whom became the prosecution's chief witness against him, was entitled to cross-examine the prosecution witness about a civil suit he intended to file against defendant for injuries sustained during the confrontation, in order to show witness's potential bias in testifying).

These cases, however, do not govern the disposition of the instant question. Unlike the expert witnesses in Grutski and Blue Stamp, Dr. Booth was never paid any fee for his testimony as an expert witness on behalf of the Poletts at trial regarding the issue of causation, either under the tolling agreement or otherwise; thus, there existed no direct monetary incentive from the tolling agreement which could have influenced his

trial testimony. Also, Dr. Booth was not a party to the instant litigation at the time of trial. Further, Dr. Booth was assured that he would not be the target of any future litigation by either of the parties when he testified at trial, inasmuch as the tolling agreement was cancelled by the Poletts by that point — thereby time-barring any possible claims by the Poletts against Dr. Booth — and, as discussed previously, Appellees expressly stipulated that Dr. Booth was not responsible for Mrs. Polett's injuries. As a result, Dr. Booth did not face any possible adverse financial consequences from the outcome of the trial as the corporate officer did in Blue Stamp, nor could Dr. Booth, by testifying at trial, enhance the prospect of a favorable outcome to him in civil litigation to which he was a party, as the witnesses in Butler and Birch could realize through their trial testimony.

Our decision in Hatfield, supra, though, provides more pertinent guidance.[11] Hatfield was a negligence and products liability action brought by a plaintiff against the wholesale and retail sellers of an allegedly defective chair which collapsed when she sat on it. The sellers, in turn, joined the manufacturer as an additional defendant. Prior to trial, the sellers and their insurer entered into a "settlement and reimbursement agreement" with the plaintiff under which they agreed to pay the plaintiff two lump sum payments for her injuries, as well as a monthly annuity payment. The agreement obligated the plaintiff to continue litigating the suit against the manufacturer, required her to pay 50% of the costs of that litigation, and mandated that she reimburse the

---

[11] We note that AMEC, the unpublished memorandum decision of a federal magistrate judge relied on by the Superior Court, is not binding on us in these proceedings, and we find it to have scant value in our resolution of this issue, inasmuch as it did not purport to address the question of the admissibility of tolling agreements under Pennsylvania law.

sellers and their insurer $50,000 if they prevailed in the suit at trial, or $25,000 if the plaintiff settled the matter.

At trial, the manufacturer sought to introduce the agreement into evidence, which the trial court permitted, as it deemed the agreement relevant to the jury's weighing of the credibility of the sellers' testifying witnesses. The Superior Court reversed, finding the agreement's admission barred by 42 Pa.C.S. § 6141 (barring admission into evidence of any "final settlement and release"). In turn, our Court granted allowance of appeal and reversed the Superior Court, holding that the agreement, by its terms, did not constitute a settlement as that word was defined by Section 6141.

With respect to the question of the agreement's relevancy at trial, we opined that "the Agreement is certainly relevant in tending to show the original [sellers'] bias." Hatfield, 610 A.2d at 450. We viewed the bias as originating from the fact that the agreement indicated "an ongoing relationship [between the plaintiffs and sellers], thereby implicitly joining nominal adversaries in an alliance against the remaining defendant. This has the effect of distorting the adversarial process assumed by the trier of fact to exist." Id. at 452.

Critically, however, our Court took great care to emphasize that, even though the agreement was relevant impeachment evidence, the trial court was under no obligation to admit the entire agreement into evidence, or even parts thereof. Instead, we made clear that a trial court is to perform its traditional role as an evidentiary gatekeeper, and exercise its discretion in determining the admissibility of such an agreement by balancing its relevancy against the potential prejudice which could ensue from its introduction into evidence:

> The court, as with all proffered evidence, should review the agreement, balance the relevancy of it against the potential prejudice, and, exercising judicial discretion, admit or exclude as much as it deems appropriate. However, where an agreement clearly allies two or more parties against another, such that a clear potential for bias exists which would not otherwise be apparent to the factfinder, that part of the agreement, *or at least the existence of the reason for the potential bias, must be conveyed to the factfinder*.

Id. at 452 (footnotes omitted) (emphasis added).

The tolling agreement in the case *sub judice* differs, of course, from the settlement and release agreement at issue in Hatfield, in that, as discussed above, Dr. Booth was not a party at trial, and, therefore, the tolling agreement he entered into did not involve a pretrial monetary settlement with the Poletts such that Dr. Booth could be considered "allied" with them against Appellees as to apportionment of liability for Mrs. Polett's damages. Accordingly, the tolling agreement did not create the same potential bias on the part of Dr. Booth in giving his trial testimony, which we stressed that the jury should be made aware of in Hatfield — i.e., a financial inducement to shift responsibility for causing plaintiff's injuries to another party, due to the prospect of obtaining reimbursement from the plaintiff for a final verdict or settlement agreement.

Nevertheless, the essence of Appellees' claim of relevance regarding the tolling agreement's admissibility rests on a similar "alliance" theory — namely, that the tolling agreement between Dr. Booth and the Poletts evidenced their mutual interest in having Dr. Booth render a causation opinion which shifted the blame for causing Mrs. Polett's injuries to Appellees, thereby creating potential bias on the part of Dr. Booth. We, therefore, regard the principles articulated in Hatfield as furnishing the proper framework for reviewing the trial court's exercise of discretion in precluding admission of the tolling agreement, or allowing mention thereof, as these principles are consistent with the general requirements for admissibility of impeachment evidence under our Rules of

Evidence — i.e., that the evidence be relevant, and that its probative value not be outweighed by its potential to cause prejudice, confusion, or delay.

As discussed, *supra*, the trial court determined that the tolling agreement was not relevant, in part, because of the timing of the formation of Dr. Booth's opinion. In the trial court's view, Dr. Booth's opinion was formed at the time he wrote his first treatment notes in September and October 2006 identifying the bicycle ride as the genesis of Mrs. Polett's injuries, and, thus, because the tolling agreement was not in existence at that time, the trial court found that the agreement could not have influenced his opinion. The trial court also found that Appellees' stipulation that Dr. Booth was not negligent, Dr. Clark's concurrence that the bike ride was a cause of Mrs. Polett's injuries, and the fact that Dr. Booth did not place responsibility on Appellees to be additional factors minimizing its relevancy.

We agree with the trial court that the tolling agreement was not relevant to show interest or bias on the part of Dr. Booth at the time he wrote his treatment notes in September and October 2006, since the agreement was not in effect at the time.[12] However, at the time Dr. Booth wrote his June 4, 2008 treatment note, and when he was questioned by the Poletts during his 2009 deposition about what caused Mrs. Polett's series of knee problems, falls, and injuries, the effect of the tolling agreement on Dr. Booth — i.e., that it indicated he was subject to a potential suit by the Poletts — was a source of potential bias or interest. Dr. Booth described this effect in his deposition:

_____

[12] As explained at greater length infra, the trial court's finding that the tolling agreement did not cause Dr. Booth to form his ultimate opinion as to causation, and that he developed it prior to being presented with the agreement, is supported by the record; however, that is not dispositive of the question of whether, as Appellees argue, Dr. Booth had an interest or bias at the time he *expressed* that causation opinion at his deposition, which bias they contend was caused by the tolling agreement.

This [June 4, 2008 treatment] note was prompted by Mr. Polett, as it says in the beginning of the note, asking me for a tolling agreement, which I never heard of. Not that I'm a novice in the malpractice wars, but this was something new to me. I was shocked by it, and disappointed that — because I wanted to keep taking care of her. *And now we have all got this sword hanging over us that has culminated with today — not culminated, but continues today.* And so this is written out of petulance, but I do believe that what I was trying to suggest was that I didn't think that we did anything wrong here. We have tried to do everything that we possibly could for these people.

* * * *

I was dealing, as the preceding note says, that somebody was getting better, still had trouble, if I'm working out of my mind [sic] what to do *and then I'm approached about this tolling agreement, which was my first inkling that there was some legal implication to our relationship*. And I have had, and I hope still have, a really good relationship with the Poletts. I really like them as patients. *This was very polarizing to me. No physician likes the implications that there is going to be a suit.* And I never even heard of a tolling agreement.

So my initial reaction is that I don't know what I did wrong here. I thought I did everything right that I could. And if there was any provocative event for this whole string of problems, it was probably the bike and I wasn't — I didn't feel I was responsible for that . . . . I then called [my attorney] expeditiously.

Dr. Booth Deposition, 6/26/09, at 102, 184-85 (emphasis added).

A fair reading of this testimony indicates that what affected Dr. Booth the most was not the receipt of the tolling agreement itself, or any of its terms, which he admitted that he did not understand, but, rather, what he considered that agreement to *represent* — the possibility that he could be subjected to a lawsuit by the Poletts for his treatment of Mrs. Polett. Dr. Booth's understandable discomfort at the thought that the Poletts, people with whom he had a long-standing professional relationship, might sue him was,

thus, the proverbial "sword of Damocles"[13] hanging over Dr. Booth's head at the time he wrote his June 4, 2008 treatment note and rendered his causation opinion during the deposition a year later. The "sword" was not, as argued by Appellees, the tolling agreement itself. Rather, the tolling agreement was relevant to the extent that it indicated to Dr. Booth that he might be subject to suit. Dr. Booth's interest in avoiding that happenstance, in turn, could have impacted the credibility of the expert causation opinion he expressed during that deposition.[14] Accordingly, we agree with the Superior Court that the tolling agreement had relevance for impeachment purposes.

We must, therefore, turn to whether, under Pa.R.E. 403, admission of evidence concerning the tolling agreement itself was, nevertheless, excludable at trial because its probative value was outweighed by the potential for prejudice, confusion or delay.[15]

---

[13] The expression "sword of Damocles" originated from a Greek fable in which King Dionysius suspended a sword by a hair over the head of Damocles, one of his courtiers, as he dined at a sumptuous banquet, in order to illustrate the grave danger that all rulers are constantly under. Because the presence of the sword caused Damocles great fear for his safety, and robbed him of enjoyment of the banquet, this expression has, thus, colloquially come to be understood to signify a threat of imminent danger. Hendrickson, Word and Phrase Origins at 701 (3rd. ed. 2004).

[14] We do not mean to suggest, one way or the other, that the Poletts, in fact, had any viable causes of action against Dr. Booth.

[15] As indicated above, in their motion *in limine* before the trial court, the Poletts challenged the admissibility of the tolling agreement on two grounds, arguing that it was irrelevant under Pa.R.E. 401, and also that, even if it had relevance, Pa.R.E. 403, nonetheless, barred its introduction; hence, we deem the trial court's grant of the motion *in limine*, in full, to be a ruling in favor of the Poletts on both contentions. Accordingly, just as the Superior Court did, we presently consider whether the trial court was within its discretion to exclude the tolling agreement under Pa.R.E. 403. The Superior Court, after reversing the trial court's conclusion that the agreement was irrelevant, conducted its own review of the evidentiary record and concluded that, under Pa.R.E. 403, the probative value of the agreement outweighed its prejudicial value. As we review the record from the same vantage point as the Superior Court, we may consider the record (continued…)

Consistent with the teaching of Hatfield, merely because the effect of the tolling agreement had some relevance to impeach the credibility of Dr. Booth regarding the causation opinions expressed in his June 4, 2008 treatment note and during his deposition, that fact alone did not require that the trial court admit all or any part of the agreement into evidence at trial, or permit Dr. Booth to be questioned about it. As we emphasized in Hatfield, what is of critical importance is that a party seeking to impeach a witness on the basis of an agreement, to which the witness is a signatory, be permitted to convey to the factfinder "*at least the existence of the reason for the potential bias*" on the part of the witness. Hatfield, 610 A.2d at 452 (emphasis added). Here, the trial court's order granting the Poletts' motion *in limine* was narrowly confined to precluding admission of the tolling agreement into evidence or any reference thereto — nothing more. Therefore, the probative value of the tolling agreement itself was scant, as it would have afforded no additional factual information or basis for Appellees to impeach the credibility of Dr. Booth, beyond that which they were already freely permitted to inform the jury — namely, that Dr. Booth rendered an opinion as to the causation of Mrs. Polett's injuries during time periods when the possibility of a lawsuit by the Poletts against him existed.[16]

---

(…continued)
evidence *de novo*, and determine whether the Superior Court erred in reversing the trial court's evidentiary ruling. Commonwealth v. Cohen, 605 A.2d 1212 (Pa. 1992).

[16] Respectfully, on this issue, the dissent appears to conflate the question of what constitutes relevant evidence under Pa.R.E. 401 with the question of how the probative value of such evidence, even if relevant under Pa.R.E. 401, is to be assessed under Pa.R.E. 403. See Dissenting Opinion (Eakin, J.) at 1-2. Contrary to the suggestion of the dissent, for purposes of Pa.R.E. 403, the probative value of challenged evidence is determined not merely by the relevance of the evidence, but, rather, by the need for
(continued…)

Moreover, the slight probative value of the tolling agreement itself in this situation was considerably outweighed by its potential for causing jury confusion, and delay in the trial process. The tolling agreement was not self-explanatory; hence, the jury could not properly consider it in a vacuum. The jury could not reasonably be expected to automatically understand the nature and purpose of such an agreement upon seeing or hearing of it. Further, the fact that a witness has signed a tolling agreement does not, *ipso facto*, indicate that he or she may now be biased because of a fear of being sued. As the Poletts have noted, parties have myriad motivations in entering into these types of agreements, including the salutary purpose of maintaining a professional relationship with the party who has requested the agreement, which we agree has particular importance in promoting the preservation of doctor-patient relationships. Additionally, as one commentator has observed, the act of signing such an agreement may actually *reduce* a potential defendant's fear of being the target of a lawsuit. See Christopher R.

---

(…continued)
such evidence in light of other available evidence which establishes the same fact. See 1 John W. Strong McCormick on Evidence, 647 n. 62 § 185 (5th. ed.) ("If other evidence, which does not carry the same dangers with it, could be used to establish the same fact, then the marginal probative value of the evidence in question is slight or non-existent."); 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5214, at 272–73 (1978) ("In measuring probative worth under [Federal] Rule 403 the judge cannot focus exclusively on the challenged evidence, but must look at other evidence already introduced or available to the proponent. Just as the probative worth of the evidence may decline when compared to the need for its use, so may that value increase when considered in connection with other evidence in the same or adjacent lines of proof."); State v. Covell, 725 A.2d 675, 683 (N.J. 1999) ("Probative value is enhanced by the absence of any other evidence that can prove the same point. Conversely, relevant evidence [loses] some of its probative value if there is other non-inflammatory evidence available to prove that point."(citation omitted)). Accordingly, trial judges are given wide latitude in assessing the probative value of evidence in light of its relationship to the other evidence in the case.

Leslie, Esquire., Den of Inequity: The Case For Equitable Doctrines In Rule 10B-5 Cases, 81 Cal. L. Rev. 1587, 1640 (1993) ("The advantages [of tolling agreements] for potential defendants are . . . obvious. Without the ability to agree to toll the statute of limitations, plaintiffs would be compelled to cast a wide net and sue all potential defendants in order to preserve any actions against the truly culpable. By agreeing to toll the statute of limitations, defendants enhance the probability that a plaintiff ultimately will decide not to bring suit against them."). Tolling agreements, in and of themselves, are, therefore, not indicative of the nature and degree of a signatory's potential bias, without a full explication of the particular circumstances which led that person to enter into the agreement.

Hence, in order to give the jury a complete understanding of what the tolling agreement in this case was, as well as its potential for creating bias on the part of Dr. Booth, the jury would, at the very least, have been subjected to a separate proceeding apart from the main trial, in which a qualified witness on legal matters would have been required to testify and be cross-examined by the parties. Further, the conduct of such a proceeding would have created the chance that the parties would have exposed Dr. Booth to intrusive questioning about the subjective reasons which motivated him to enter into this particular agreement. The pernicious danger of this inquiry is particularly acute, given the prospect of its intrusion into privileged discussions between Dr. Booth and his attorney which transpired during the formation process of the agreement. Furthermore, this inquiry could have resulted in counsel for the Poletts being called as fact witnesses regarding what they communicated to Dr. Booth which, as noted by the dissent below, could have interfered with their ability to continue to represent their

clients.  See Pa.R.Civ.P. 222 ("Where any attorney acting as trial counsel in the trial of

an action is called as a witness on behalf of a party whom the attorney represents, the

court may determine whether such attorney may thereafter continue to act as trial

counsel during the remainder of the trial."); R.P.C. 3.7(a) (generally barring a lawyer

from acting as an advocate when the lawyer is likely to be called as a witness, subject

to certain narrow exceptions).  Finally, such a proceeding would have been excessively

time consuming and diverted the jury's attention away from their consideration of the

central issue in the case — whether Appellees were negligent in causing Mrs. Polett's

harm.

Consequently, we conclude the Superior Court erred in deeming evidence

regarding the tolling agreement admissible under Pa.R.E. 403:  the trial court was within

its discretion to hold the agreement had minimal probative value, which was outweighed

by its potential to cause confusion to the jury, as well as the prospect of unnecessary

delay in the conduct of the trial.  Accordingly, we reverse the Superior Court's decision

on this issue.


### B.  Whether the trial court abused its discretion in ruling that Dr. Booth's expert testimony was not excludable under Pa.R.Civ.P. 4003.5

We next turn to the question of whether the trial court abused its discretion in not

excluding, under Pa.R.Civ.P. 4003.5, Dr. Booth's expert testimony on the issue of

causation of Mrs. Polett's injuries, as the Superior Court found.[17]

---

[17] The relevant portion of Rule 4003.5, at issue in this appeal, provides:
**Rule 4003.5. Discovery of Expert Testimony. Trial Preparation Material.**
(continued…)

The Poletts argue that Rule 4003.5 applies only to those expert opinions "acquired or developed in anticipation of litigation or for trial," and, therefore, does not preclude the admissibility of a treating physician's opinion developed during the time he or she was caring for the patient. Poletts' Brief at 41. The Poletts cite the principal decision of our Court interpreting this rule, <u>Miller v. Brass Rail Tavern</u>, 664 A.2d 525, 531-32 (Pa. 1995) (holding that, because county coroner formed opinions as to time of death and cause of death in the performance of his official duties, these opinions "were not acquired or developed with an eye toward litigation, [and so] Rule 4003.5 is inapplicable"), as underscoring the chief purpose of the rule — preventing surprise. In

---

(…continued)

> (a) Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:
>
> (1)  A party may through interrogatories require
>
>    (A)  any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and
>
>    (B)  subject to the provisions of subdivision (a)(4), the other party to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his or her answer a report of the expert or have the interrogatories answered by the expert. The answer or separate report shall be signed by the expert.
>
> * * *
>
> (b) An expert witness whose identity is not disclosed in compliance with subdivision (a)(1) of this rule, shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

Pa.R.Civ.P. 4003.5.

accordance with that purpose, the Poletts note that our Court emphasized in that case that this rule is "a shield to protect against surprise" but not "a sword" to be used to prevent the admission of an opinion which a witness developed during the course of performing his or her work duties, and not in the capacity of a paid expert. Poletts' Brief at 41-42 (quoting Miller, 664 A.2d at 530-31).

The Poletts highlight the application of this principle by the Superior Court in the case of Neal by Neal v. Lu, 530 A.2d 103 (Pa.Super. 1987), in which that tribunal found that a treating physician could testify as an expert witness in his own defense, because his opinions "were not the work product of a well-prepared litigant. They pre-dated any litigation and are the very gist of [the plaintiff's] cause of action." Poletts' Brief at 42 (quoting Neal, 503 A.2d at 108). The Poletts contrast the instant case with the decision of the Superior Court in Kurian, supra, and that of the Commonwealth Court in Smith v. SEPTA, 913 A.2d 338 (Pa. Cmwlth. 2006) (treating physician barred from testifying under Rule 4003.5, since, although plaintiffs indicated they would be presenting treating physician as expert on the issue of causation, they did not disclose his identity as a witness and disclosed only treatment records in which he did not render an opinion as to causation), since the treating physicians of the respective plaintiffs in those cases did not develop their opinions during the treatment process. Instead, those experts developed their opinions solely in anticipation that they would be called as an expert witness in litigation, and, thus, their testimony was properly excluded under Pa.R.Civ.P. 4003.5.

The Poletts contend the factual record of the present case supports the trial court's conclusion that Dr. Booth developed his opinion that the bicycle ride was the cause of Mrs. Polett's injuries during the course of his treatment relationship with her, and at a time that predated any prospect of litigation. Specifically, they reference Dr.

Booth's treatment notes written on September 20 and October 23, 2006, as evidence that, at the time he wrote those notes, he had formed an opinion as to causation, which he reiterated in his June 4, 2008 treatment note. The Poletts emphasize that the 2006 treatment notes provide solid grounding for the trial court's finding that, when he wrote those notes, Dr. Booth needed to find the source of Mrs. Polett's difficulties. Correspondingly, they aver the trial court properly found that those notes reflected Dr. Booth's concern with the possibility that Mrs. Polett had developed a knee infection, and that additionally he determined, at the time of their authoring in 2006, that Mrs. Polett was suffering synovitis caused by the bicycle ride in the video. Poletts' Brief at 50 (quoting Trial Court Opinion, 6/10/11, at 25). The Poletts additionally aver that Dr. Booth consistently testified, both in his deposition and at trial, that he developed his causation opinion in 2006, as reflected by his notes.

Further, the Poletts maintain that the trial court's conclusion that Appellees were not surprised by, or unable to learn of, Dr. Booth's expert opinion on causation prior to trial is supported, due to the fact they knew of his opinions from having access to all of his treatment notes. Moreover, according to the Poletts, the fact that Appellees actually *deposed* Dr. Booth and, during that deposition, he discussed extensively his causation opinions, indicated that "[Appellees] had a far greater opportunity to learn Dr. Booth's expert opinions than litigants normally enjoy under Pennsylvania rules, and certainly were not 'unable' to learn his opinions before trial." Poletts' Brief at 51.

The Poletts assert that, given this lack of surprise and prejudice to Appellees from Dr. Booth's testimony, the trial court properly found that Rule 4003.5 did not preclude him from testifying as an expert, and that the Superior Court, by contrast, improperly substituted its own assessment of the evidence for that of the trial court

when it overruled that court. In so doing, the Poletts proffer, the Superior Court failed to give adequate deference to the trial court's discretionary judgment.

Appellees respond by arguing that Rule 4003.5 may prevent a treating physician from testifying as an expert if the physician did not acquire or develop his opinions during the normal course of treatment, but did so in anticipation of litigation. In their view, as illustrated by Kurian and Smith, mere observations made during the course of treatment, such as those reflected in Dr. Booth's treatment notes, are not enough to establish causation. Appellees endorse the Superior Court's finding that Dr. Booth's treatment notes constituted only his observations, and not an expert causation analysis.

Appellees then focus on his deposition testimony and contend that, because Dr. Booth rendered his causation opinion during that deposition, it was an opinion developed in anticipation of litigation and should have been excluded under Pa.R.Civ.P. 4003.5. Appellees suggest that Dr. Booth's deposition testimony demonstrates that "he was not concerned with identifying the cause of Mrs. Polett's injuries, but in treating them." Appellees' Brief at 52. Additionally, they contend that his deposition testimony showed that he only was repeating what Mrs. Polett told him, did not watch the exercise video, nor did he attempt to rule out other causes — all things which a proper causation analysis would require. Appellees also maintain that Dr. Booth's June 4, 2008 treatment note reflected that this was the first time he started to blame them for Mrs. Polett's problems and that he was prompted to do so by his receipt of the tolling agreement. Echoing the reasoning of the Superior Court, Appellees argue that the fact that Dr. Booth began "finger pointing" in that note demonstrates that his opinion was reached in anticipation of this litigation. Appellees' Brief at 53. Because, in Appellees' view, the record confirms that Dr. Booth did not reach his causation opinion until at least that point in time, this case is distinguishable from Miller.

Appellees additionally argue that they suffered prejudice from the Poletts' alleged violation of Rule 4003.5 because of their alleged lack of notice of Dr. Booth's causation opinion from his treatment notes, and the fact that they treated his deposition as one of a "fact witness." Appellees' Brief at 56.[18] They claim that, as a result, they were "denied his 'opinions' on causation, his analysis and how he reached those 'opinions,' and what, if anything, he relied upon in doing so." Id. at 57. Appellees contend they had no chance to request a continuance to respond to Dr. Booth's testimony, since their motion *in limine* was not decided until the day of trial.

Our standard of review of the question of whether the trial court properly permitted Dr. Booth to render expert testimony on the issue of causation is whether the trial court abused its discretion. Grady v. Frito-Lay, 839 A.2d 1038, 1046 (Pa. 2003); Commonwealth v. Walker, 92 A.3d 766, 772-73 (Pa. 2014). An abuse of discretion may not be found simply because an appellate court might have reached a different conclusion than the trial court; rather, to constitute an abuse of discretion, the trial court ruling must be the product of "manifest unreasonableness, or partiality, prejudice, bias,

---

[18] Relatedly, Appellees claim that Dr. Booth's attorney conceded in his deposition that he was not testifying as an expert witness. We do not read the deposition testimony so broadly. After Dr. Booth gave his testimony regarding his opinion that the bicycle ride caused Mrs. Polett's injuries, counsel for the other now-dismissed co-defendants — New City Productions and Franck — requested Dr. Booth watch the exercise video. Dr. Booth's counsel instructed him not to do so because, in her view, that would require him to "act as an expert." Dr. Booth Deposition, 6/26/09, at 194. Our reading of this testimony leads us to conclude that, while counsel was expressing her opinion as to the role Dr. Booth would be acting in if he viewed the video, this opinion was not a legal concession as to whether Dr. Booth had already rendered an expert opinion in his testimony regarding his treatment of Mrs. Polett. Indeed, co-defendants' counsel plainly regarded Dr. Booth as already having given an expert causation opinion by that point, as she argued, in response to Dr. Booth's counsel: "[Dr. Booth] has given testimony here today there is some link between the filming and her subsequent problem, so he has given expert testimony here today." Id. Regardless, these subjective opinions do not govern our present legal analysis of this question.

or ill-will, or such lack of support so as to be clearly erroneous." Grady, 839 A.2d at 1046 (quoting Paden, 658 A.2d at 343). Consequently, when reviewing the trial court's exercise of discretion, it is improper for an appellate court to "step[] into the shoes" of the trial judge and review the evidence *de novo*. Commonwealth v. Clay, 64 A.3d 1049, 1056 (Pa. 2013). As we consistently have emphasized in our jurisprudence, where the record does not reflect an abuse of discretion by the trial court, the Superior Court may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court. See, e.g., Bratic v. Rubendall, 99 A.3d 1, 10 (Pa. 2014); Ball, supra, 67 A.3d at 770; Botek v. Mine Safety, 611 A.2d 1174, 1176 (Pa. 1992).

Applying the aforementioned standard of appellate review, we must determine whether the trial court's ruling that Dr. Booth's causation opinion was not excludable under Rule 4003.5 constituted an abuse of discretion.[19] As the trial court found, and the parties do not dispute, the Poletts did not hire or retain Dr. Booth as an expert for the purpose of rendering an expert opinion at trial; thus, the pivotal question under Rule 4003.5, as contested by the parties, was whether his opinion as to causation of Mrs. Polett's injuries was "acquired or developed in anticipation of litigation or for trial." Pa.R.Civ.P. 4003.5. Accordingly, as recognized by the dissent below, the point in time at which Dr. Booth first came to his conclusion that the bicycle ride during the exercise video was the triggering event which caused the medical condition — synovitis — which, in turn, led to Mrs. Polett's subsequent medical problems, is dispositive of this question.

---

[19] As the trial court's ruling in question was made prior to the commencement of trial, the evidence we examine is confined to only that which was available to the trial court at the time of its ruling and, hence, we do not consider evidence adduced at trial in our review. Gallagher v. Pa.L.C.B., 883 A.2d 550, 559 n.11 (Pa. 2005).

At the time of the trial court's ruling on Appellees' motion *in limine* to exclude Dr. Booth's testimony, it had before it Dr. Booth's 2006 treatment notes, as well as his deposition testimony. Trial Court Opinion, 6/10/11, at 22, 24. The trial court found that the words of Dr. Booth's 2006 treatment notes "speak for themselves," noting that, "[f]or two years prior to any litigation, Dr. Booth had to evaluate the cause of Mrs. Polett's injuries in order to treat her." Id. at 25. The court found that these notes reflected "his concern about the possibility of an infection," and that, in 2006, he determined the bike ride was the cause of her synovitis. Id. Although the Superior Court obviously viewed the September and October 2006 treatment notes differently than did the trial court — finding that they showed only "a temporal connection between Mrs. Polett riding the exercise bike and her injuries," Polett, 83 A.3d at 220 — this *de novo* interpretation was not a valid basis for it to disturb the trial court's interpretation. As we have repeatedly instructed, in reviewing a trial court's discretionary consideration of evidence, an appellate court is not to make a first-hand assessment of that evidence as if it were the trial court, but rather is to confine its review to the question of whether, in light of that evidence, the trial court's ruling was manifest[ly] unreasonable, or so lacking in support as to be "clearly erroneous." Grady, supra. We conclude that the trial court's understanding of the meaning of those notes, as reflecting Dr. Booth's contemporaneous impression as to the cause of Mrs. Polett's medical difficulties, was neither manifestly unreasonable nor clearly erroneous, but, rather, was a rational interpretation supported by the evidence of record.

The September 20, 2006 treatment note indicates that Dr. Booth was actively engaged in the process of determining the cause of the deterioration in Mrs. Polett's condition since the last time he saw her in August 2006, prior to her riding the bicycle, because, as the trial court logically found, such a determination of cause would be

critical to his chosen treatment.[20]  This treatment note specifically recounted that the discomfort in Mrs. Polett's knees occurred "after riding a bicycle," and that she had "synovitis" and "some loss of motion."  Trial Court Opinion, 6/10/11, at 24; Dr. Booth Treatment Note, 9/20/06 (Plaintiff's Trial Exhibit 3).  The note also indicated that Dr. Booth expressly ruled out an infection as the cause of her problems, as he found "no evidence" of such, nor the presence of any other "serious problem."  Id.  This recordation leads to the reasonable conclusion that Dr. Booth, by process of elimination, had identified the cause of the medical problems he was seeing at that time to be Mrs. Polett's riding of the bicycle.

Dr. Booth's October 23, 2006 treatment note reinforced his view that the origin of Mrs. Polett's medical problems, which by then had worsened, was the bicycle ride.  In that note he stated: "The patient returns today with persistent discomfort in both knees. This dates from the time of her exercise bike for video purposes."  Dr. Booth Treatment Note, 10/23/06.  In that note, Dr. Booth also remarked that Mrs. Polett had "several degrees of lost extension in both knees, which I feel is related to her problem."  Id.  As the trial court determined, this note also could be reasonably construed to be an

_____

[20] *Amicus*, while largely tracking the arguments of the Poletts on this issue, also has referenced an instructive trial court opinion, Graham v. I.M.O., 16 Pa. D. & C. 4th 492 (Allegheny Ct. Com. Pleas 1992), written by Judge R. Stanton Wettick — a long-recognized authority on matters of civil litigation —  which, in our view, saliently describes why the observations of a treating physician form an integral basis of an expert opinion developed by that physician.  As Judge Wettick opined therein:

> [A] physician who participates in treating a patient occupies a very different position from a specially retained expert who bases his or her conclusion and opinions on hospital records and the testimony of those who have firsthand knowledge of the patient's condition and the treatment provided. Any conclusion and opinions of a physician who provided treatment will necessarily be interwoven with and influenced by the factual observations made in the course of treatment.

Id. at 501.

expression by Dr. Booth of his belief that there existed a causal linkage between Mrs. Polett's unfolding medical problems and the bicycle ride.

The June 4, 2008 treatment note relied upon by the Superior Court for its conclusion that Dr. Booth's opinion was developed at the time he received the tolling agreement does not render the trial court's finding that Dr. Booth formed his causation opinion at the time he wrote his 2006 treatment notes manifestly unreasonable, nor clearly erroneous. Dr. Booth wrote in his June 2008 treatment note: "I have explained that in my opinion it is the filming company who asked to 'interview' Mrs. Polett with whom the responsibility lies, as well as those who employed them. I do not feel that the hospital or myself has any obligation." Dr. Booth Treatment Note, 6/4/08. Although the Superior Court interpreted this note as the first time Dr. Booth associated Mrs. Polett's injuries with the exercise bike (and influenced by the possibility of litigation), this note cannot be read in isolation from the September and October 2006 treatment notes in which Dr. Booth indicated a causative link between Mrs. Polett's medical difficulties and her riding the exercise bike. When considered in conjunction with those 2006 notes, the June 2008 treatment note can, thus, logically be construed as Dr. Booth's recitation of his explanation of the opinion which he already had developed in 2006 as to the genesis of Mrs. Polett's knee problems. The trial court considered all three of these treatment notes in making its finding as to the point in time at which Dr. Booth first formed his causation opinion, and the June 2008 note did not affect its ultimate factual determination. Inasmuch as the trial court's finding was neither manifestly unreasonable nor clearly erroneous, it was error for the Superior Court to override the trial court's judgment based on its own interpretation of the meaning of the June 2008

treatment note, and to use this interpretation as the basis to overturn the trial court's ruling.[21]

---

[21] Although the trial court did not rely on Dr. Booth's deposition testimony in making its ruling, its conclusion that Dr. Booth developed his causation opinion during Mrs. Polett's office visits in September and October of 2006 is bolstered by that deposition testimony. At his deposition, Dr. Booth testified that, when he saw Mrs. Polett on September 20, 2006, he was "surprised" to see her again so soon, as she had been doing so well during her previous visit. Dr. Booth Deposition, 6/26/09, at 40. Upon observing Mrs. Polett's swollen knees and diminished range of motion, and hearing of her soreness, he stated he was "disappointed" to see the reversal in her recovery progress, which had transpired since her prior office visit, and, also, to learn that she had "been put on [an exercise] bike and had done something that I wouldn't have wanted her to do." Id. at 41-42. He explained that "what happens is, if you get on an exercise bike or push your knees in any way, sometimes they will swell, and that swelling limits your ability to bend and straighten your knee completely, and that looked like what was going on." Id. at 45. As he did in his treatment note, Dr. Booth reiterated that what he was seeing at that time was "synovitis, which is an inflammation of the lining of the knee," and he additionally recounted his belief that the synovitis was responsible for causing the lessened motion he detected during that visit. Id. at 46, 105.

Dr. Booth further testified in this deposition that, when he saw Mrs. Polett on October 23, 2006, he continued to think, at that time, that the synovitis and inflammation he was seeing was caused by her riding of the exercise bike on August 21, 2006 during the filming of the video:

> Q. So did you think on October twenty-third that what she was complaining about was caused by the exercise bike experience of August twenty-first?
> A. I think her problem that I was seeing at that point dated from that time, and I think the inflammation and the synovitis for sure were from that exercise.
>
> * * *
>
> Q. When you saw her on [October] twenty-third, did you believe that what you were seeing in terms of what you wrote here, persistent discomfort in both knees, was caused by what had occurred on August twenty-first when she had been on the exercise bike?
> * * *
> A. I think that was the most likely explanation at that point, yes.

(continued…)

Additionally, we find Appellees' contention that they were prejudiced by the lack of a formal expert report prepared by Dr. Booth, or the introduction at trial of his opinion as to causation, meritless. The trial court found that Appellees were not "unfairly surprised" by the prospect of Dr. Booth's testimony, nor otherwise unable to learn of his expert opinion prior to trial. Trial Court Opinion, 6/10/11, at 22. The court observed that Appellees had full access to Dr. Booth's treatment notes, and, critically, had participated in his deposition.

As our Court emphasized in Miller, "the purpose of Rule 4003.5 is to prevent surprise," and, as a consequence, it should not be used as "a sword" to prevent testimony from a party's witness when the opposing party is both aware that the witness will testify at trial, and is aware of the substance of the expert opinion which the witness will be rendering. Miller, 664 A.2d 525, 530 n.3. In the case at bar, Dr. Booth expressed a causation opinion during his deposition, consistent with that which he gave at trial. During his deposition, Dr. Booth described how the synovitis he observed during Mrs. Polett's September and October 2006 office visits was the triggering event, which caused her to suffer a subsequent chain of myriad medical misfortunes:

> Q. But for the bike incident, you don't believe any of the rest of this would have happened; is that correct?
>
> * * *
>
> A. Probably not. I mean, she is not the only complication I've got, and other people have other things happen to them. But I think the bike caused her to have a swollen knee that lost motion.
>
> * * *

---

(…continued)
Id. at 52-53. This testimony, therefore, also provides support for the trial court's conclusion that Dr. Booth developed his causation opinion during his treatment of Mrs. Polett in the immediate aftermath of her bicycle ride during the Fall of 2006, and not in anticipation of this litigation, which was not commenced until nearly two years later.

> So that whole escalating attempt to make her knee well again probably would not have happened if she hadn't lost that initial motion, and that began with the bike.

Dr. Booth Deposition, 6/26/09, at 105-06. As recounted previously, Dr. Booth likewise testified at trial that the synovitis caused by the bicycle ride was the "watershed event" which triggered the cascade of medical problems, falls, and surgeries which Mrs. Polett endured thereafter. See supra, at pp. 11-12. Thus, the trial court's pretrial ruling, that Appellees could not claim to be unfairly surprised by Dr. Booth's causation testimony, was neither manifestly unreasonable, nor clearly erroneous, as Appellees were made fully aware of Dr. Booth's specific causation theory during a deposition in which, as the trial court noted, they were present, and in which they cross-examined Dr. Booth.[22]

In sum, the trial court's ruling that Dr. Booth's expert testimony as to causation was not barred by Pa.R.Civ.P. 4003.5 was amply supported by the evidence of record, and thus was reasonable. Consequently, we conclude that the trial court did not abuse its discretion in allowing Dr. Booth to render an expert opinion at trial, and that the

_____

[22] We find the cases relied upon by Appellees to be inapt. In Kurian, the plaintiff's treating physician reviewed a prior physician's treatment report and concluded the prior physician had "apparently missed" a heart problem in the plaintiff's EKG. Kurian, 851 A.2d. at 156. Critically, however, the physician, who was not involved in treating the plaintiff at the time of the EKG, never reviewed the original EKG reading. Thus, the treating physician was rendering a second-hand opinion about causation based on an aspect of the treatment process in which he was not personally involved. This stands in stark contrast to Dr. Booth's role in the treatment process of Mrs. Polett, since his causation opinion was formed contemporaneously with his observation and treatment of her, and it was based on his personal, first-hand evaluation of the reason for the medical conditions he was endeavoring to treat.

Smith is inapposite since the plaintiff's treating physician's records in that case disclosed only the date of the patient's injury, his diagnosis of the specific injury, and his treatment recommendations; thus, they provided no basis for the defendant to know what, if any, causation opinion the treating physician had formed and would be providing at trial. By contrast, in the case at bar, Dr. Booth's treatment notes reasonably reflected what he deemed to be the cause of Mrs. Polett's injury which he was treating.

Superior Court erred by reassessing the evidence relied upon by the trial court in making its ruling, and by supplanting the trial court's findings with its own evaluation of that evidence. We, therefore, reverse the order of the Superior Court as to this issue.

### III. Whether the trial court erred in giving its supplemental jury instruction after Appellees gave their closing argument.

Finally, we consider the question of whether the trial court abused its discretion in issuing its supplemental instruction to the jury, after Attorney Stitcher gave a closing argument on behalf of Appellees in which he enumerated various proposed causes for the medical problems Mrs. Polett experienced after the bicycle ride, which neither expert had discussed in their testimony. As recounted above, see supra at p. 13, Attorney Stitcher offered other potential causes of Mrs. Polett's knee problems: her failure to attend all prescribed physical therapy appointments; not wearing a knee brace while sleeping; failing to wear a knee brace while attending church during which she felt a pop and pain in her reconstructed knee; not calling Dr. Booth immediately after the church incident; not using a cane and walker during her trip to New York City; failing to consult with Dr. Booth prior to engaging in her planned activities; and throwing out his written instructions.

The Poletts argue that the trial court was best positioned to make the assessment as to whether the supplemental charge was required, given that it was responsible for supervising the conduct of the trial, and that, as a result, it was uniquely suited to determine the necessity of the charge, since it heard all of the trial evidence, supervised the morning charging conference in which the prospect of giving such a charge was discussed in the event Appellees engaged in speculation in their closing

argument, and listened to Attorney Stitcher's closing argument first hand.[23]  The Poletts

contend that our Court has recognized that, given the trial court's distinctive vantage

point, appellate courts should give substantial deference to the trial court's decision on

charging the jury.  Poletts' Brief at 33.  The Poletts maintain that the trial court's "real

time" decision to give the supplemental instruction was reasonable under the

circumstances, and that the Superior Court gave insufficient consideration to the trial

court's broad latitude in instructing the jury, and, instead, substituted its "hindsight" for

the trial court's reasoning.  Id.

The Poletts assail the Superior Court's conclusion that the trial court's

supplemental instruction was somehow isolated from the rest of its charge, noting that

the trial court expressly reminded the jury in the supplemental instruction that it was to

incorporate its prior instructions, thereby placing the supplemental charge within the

larger context of those instructions.  Id. at 34.  The Poletts point out that the trial court,

in its main instruction to the jury on causation in the morning, informed the jury that the

---

[23]  The Poletts initially assert that Appellees' challenge to the trial court's supplemental instruction was waived because it was not raised prior to the jury retiring to deliberate, which they contend violates Pa.R.Civ.P. 227(b)(1).  We agree with the Superior Court that Appellees did not waive their challenge under this rule.  The record reflects that the trial court, after the morning charging conference, specifically deferred action on giving the supplemental charge until the afternoon trial session to determine if it would be needed after Appellees' closing arguments.  After it elected to give its supplemental instruction during the afternoon session, the trial court noted that Attorney Conroy had made clear in the morning conference that he objected to the instruction being given and, thus, considered it preserved.  N.T. Trial, 11/18/10 (A.M.), at 57–58. Given the trial court's express reassurance to counsel and consideration of Appellees' objection prior to giving the supplemental charge, we do not consider Appellees' challenge waived under Pa.R.Civ.P.  227(b)(1).  See Passarello v. Grumbine, 87 A.3d 285, 292 (Pa. 2014) ("Objections to jury instructions must be made before the jury retires to deliberate, unless the trial court specifically allows otherwise.").

plaintiffs have the burden of proving, by a preponderance of the evidence, any claims and contentions which entitle them to relief, and that the jury should make any such findings based on the trial evidence. Also, the Poletts note the trial court instructed the jury at the same time, with respect to the issue of contributory negligence, that Appellees had the burden of proof to show "that the plaintiff was negligent and that the plaintiff's negligence was a substantial factor of her injury." Poletts' Brief at 36 (quoting N.T. Trial, 11/18/10 (A.M.), at 77).

The Poletts argue that when the trial court's supplemental charge is considered together with its prior charge, the supplemental charge was a proper exercise of the trial court's discretion, given what they consider to be Appellees' lack of introduction of evidence at trial to support Attorney Stitcher's alternative theories of the cause of Mrs. Polett's injuries which he argued in his closing. The Poletts characterize the effect of the supplemental charge, when considered in conjunction with its main charge, as merely requiring the jury to confine its consideration of causation to only "the actual medical testimony presented at trial." Id. at 36-7.

The Poletts further argue that the supplemental instruction was an accurate statement of Pennsylvania law, since expert medical testimony is required to prove the element of causation in personal injury claims. Consequently, the Poletts maintain that, because Appellees introduced no expert testimony to support the assertions Attorney Stitcher made in his closing argument — as neither Dr. Booth nor Dr. Clark provided any such testimony — the trial court acted reasonably in giving the instruction.

Appellees defend the Superior Court's reversal of the trial court, endorsing its rationale that the trial court, through its supplemental instruction, improperly shifted the

burden of proof to it on the issue of causation. Appellees contend that the supplemental instruction created a presumption in favor of the Poletts by, in essence, telling the jury that they had to find that Mrs. Polett's injuries were caused by the bike absent any evidence from the defendants. Further, they maintain that this instruction deprived them of their right to challenge the adequacy of the Poletts' evidence, by requiring them to first introduce substantive evidence regarding causation. They aver that this is not required under Pennsylvania law, as they were permitted to simply attempt to rebut the Poletts case through argument to the jury. Appellees' Brief at 39 (citing Neal, supra). Additionally, Appellees argue they were prejudiced by the timing of this instruction since it was the last instruction the jury heard with respect to causation prior to its deliberations, and the only instruction to reference a specific source of Mrs. Polett's injuries — the exercise bike.

Appellees dispute that they were responsible for triggering the need for the supplemental charge, and suggest that they were merely attempting with their closing argument to persuade the jury that the Poletts did not meet their burden of proof as to causation. Appellees concede that trial courts are entitled to deference in their discretionary rulings, but proffer that the Superior Court is not required to give deference to a trial court ruling which is erroneous as a matter of law. Appellees aver that the Superior Court did review the entirety of the trial court's charge, correctly finding that it improperly shifted the burden of proof to them in violation of the law, and, thus, its ruling should be affirmed.[24]

---

[24] The arguments of *amicus* largely track those of the Poletts on this issue.

"In examining jury instructions, our standard of review is limited to determining whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case." Cooper ex. rel. Cooper v. Lankenau Hosp., 51 A.3d 183, 187 (Pa. 2012). Since this review involves a question of law, our review is plenary. Id. In conducting this review, we do not consider portions of a jury charge in isolation and, thus, do not consider "whether certain portions taken out of context appear erroneous." Reilly by Reilly v. Southeastern Pennsylvania Transp. Auth., 489 A.2d 1291, 1305 (Pa. 1985). Rather, "[w]e look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party." Id. Further, our review is guided by the tenet that trial courts have "latitude and discretion in phrasing instructions and are free to use their own expressions so long as the law is clearly and accurately presented to the jury." Cooper, 51 A.3d at 187.

In the case *sub judice*, the trial court relied on our Court's decision in Smith v. German, 253 A.2d 107 (Pa. 1969), as the legal grounding for its supplemental instruction. See Trial Court Opinion, 6/10/11 at 48. In German, the plaintiff alleged that he suffered severe psychotic personality changes as the result of an automobile accident, which led to him eating soap and milk containers during his hospitalization. At trial, to establish that a brain injury sustained during the accident was the physiological cause of his behaviors, plaintiff presented the medical testimony of doctors involved in his treatment. They testified as to their conclusion that the cause of plaintiff's behaviors was anoxia, or oxygen deprivation to the brain.

Defendant presented an alternate theory of causation — namely, that plaintiff's behaviors were the product of marital difficulties. Defendant introduced no medical evidence to support that theory of causation, but, rather, used testimony from plaintiff's divorce proceeding to show that, two years after the accident, he was upset with his wife for allegedly having an affair. On appeal to our Court, plaintiff argued that, absent some medical evidence to connect his personality changes to his marital problems, the jury should not have been allowed to simply infer that those problems were the cause of those changes.

This Court agreed and reversed, determining that the requirements for medical testimony in order to establish causation are "equally applicable when a defendant seeks to disprove the causal connection . . . presented by the plaintiff by proving one . . . of his own." German, 253 A.2d at 108. We noted that, in cases "[w]here there is no obvious causal relationship, unequivocal [m]edical testimony is necessary to establish the causal connection." Id. (citation omitted). We further opined that, conversely, such medical testimony is unnecessary in cases "so readily apparent that a layman could diagnose (except by guessing) the causal connection." Id. (citation and quotation marks omitted).

Our Court considered the question of whether the plaintiff's marital discord caused his aberrant behaviors to fall within the former category of cases, since our Court viewed the causal connection as "anything but obvious." Id. at 109. Thus, we held:

> Just as the plaintiff was required to offer expert testimony in
> order to establish the medical connection between the
> injuries arising from the accident and the personality change,
> so too is such expert testimony required by the party seeking

> to establish that it was not the injury but some other factor which caused the change. This is clearly required by our case law, because the causation here involves explanations and inferences not within the range of ordinary training, knowledge, intelligence and experience.

Id. (citation and quotation marks omitted).[25]

Applying the principles of German herein, the trial court found that "[t]here was no medical testimony presented by [Appellees] to permit the jury to speculate on an alternative causation theory based on the absences at physical therapy, sleeping without a knee brace, not calling Dr. Booth or travelling without a cane or walker. Dr. Clark was silent on these areas." Trial Court Opinion, 6/10/11, at 48. Hence, the trial court structured its supplemental charge to "advise[] the jury that they were not permitted to speculate about an alternative cause of her harm in the absence of medical evidence." Id.

We discern no legal error in the trial court's decision to supplement its original charge in light of the matters to which Attorney Stitcher referred in his closing. Inasmuch as the cause of Mrs. Polett's knee injury was something that could only be determined by the jury through expert medical testimony, as the trial court properly recognized, German forbade the jury from finding causation based on a particular activity she had engaged in unless there was expert testimony before the jury to support such a finding. Contrary to Appellees' suggestion, Attorney Stitcher was not merely attempting to cast doubt on the Poletts' expert causation testimony; rather, he was

---

[25] Since German, our Court has reaffirmed, in the context of medical malpractice cases, the need for "detailed expert testimony because a jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation." Toogood v. Owen Rogal, 824 A.2d 1140, 1149 (Pa. 2003).

*inviting* the jury to consider alternate theories of causation by arguing that the various factors enumerated above may have been the cause of Mrs. Polett's injuries, even though there was no expert testimony from any source at trial to support such a causal connection. As the trial court found, not even Appellees' own expert witness contended that any of the alternate potential causes Attorney Stitcher suggested in his argument caused Mrs. Polett's injuries.

Thus, in the absence of such evidence, a jury finding that Mrs. Polett's injuries were caused by any of the activities to which Attorney Stitcher referred would have been an exercise in speculation. Hence, to avoid this prospect, the trial court properly gave the supplemental instruction to the jury, which was an accurate statement of the law in accord with the teaching of German. See, e.g., Winchel v. Jain, 925 A.2d 782, 796 (Pa. Super. 2007) (trial court "properly refused to allow defense counsel to argue alternate theories of death for which there was no evidence."); see also Jacob R. Stein, Closing Arguments § 1:14 (2014-2015 ed.) ("Counsel must make a legitimate argument, within the purview of the recognized standards of advocacy, while seeking a result favorable to his or her client. Properly, counsel in argument is confined to the record. In other words, counsel is restricted to the law in the case, the evidence adduced from the witnesses, the exhibits admitted into evidence, and the inferences reasonably deductible from the testimony and exhibits." (footnotes omitted)).

We further reject the notion that this supplemental instruction somehow shifted the burden of proof to Appellees as to causation. If this supplemental charge, standing alone, was all that the jury received, then Appellees' argument would have substantial merit; however, the trial court also gave the jury a comprehensive charge which

explained that the Poletts bore the ultimate burden of proof to show that Appellees were negligent and that this negligence was the cause of Mrs. Polett's injuries. Further, the jury also was informed it could consider, from the trial evidence, whether Mrs. Polett's own negligence was the cause of her injuries. Relevantly, the court instructed the jury as follows:

> [I]n this case the plaintiffs claim that Mrs. Polett was injured as a result of the negligent conduct of the defendants. The plaintiffs also allege that the relationship between Mr. and Mrs. Polett has suffered due to the injuries alleged by Mrs. Polett.
>
> The plaintiffs have the burden of proving their claims.
>
> * * *
>
> In a civil case such as this the plaintiff has the burden of proving those contentions which entitle them [sic] to relief. When a party has the burden of proof on a particular issue, the party's contention on that issue must be established by a fair preponderance of the evidence. The evidence establishes a contention by a preponderance of the evidence if you are persuaded that it is more probably accurate and true than not.
>
> So think of a balance scale, and that's the kind of scale with a pan on each side. Okay? On one side of the scale place all of the evidence that you find favorable to the plaintiffs. On the other side, place all the evidence you find favorable to the defendants. If after considering the comparable weight of the evidence you feel that the scales tip ever so slightly or to the slightest degree in favor of the plaintiffs, your verdict must be for the plaintiffs. If the scales tip in favor of the defendants or they're equally balanced, then your verdict must be for the defendants.
>
> In this case Margo and Dan Polett have the burden of proving that the defendants were negligent and that their negligence was a factual cause in bringing about the damages claimed. If after considering all of the evidence you feel persuaded that these propositions are more probably true than not, then your verdict must be for the plaintiffs. Otherwise your verdict must be for the defendants, PCI and Zimmer.
>
> * * *

The defendants claim that the plaintiff was negligent and that the negligence was a substantial factor causing the plaintiff's injury. The burden is not on the plaintiff to prove her freedom from negligence and, that is, she does not have to prove that she was not negligent. The defendants have the burden of proving by a fair preponderance of the evidence that the plaintiff was negligent and that the plaintiff's negligence was a substantial factor of her injury.

You must decide whether defendants have proven that the plaintiff under all the circumstances failed to use reasonable care for her own protection. Now, this is what we call comparative negligence. I'm going to refer to the negligence and substantial factor as causal negligence.

If you decide more than one party was negligent, you must decide the different percentages of negligence attributable to each party. If you decide that the plaintiff's causal negligence was greater than the causal negligence of the defendants, then the plaintiff cannot recover any damages. If you decide that the plaintiff's causal negligence was equal to or less than the causal negligence of the defendants, then you must decide the percentage of causal negligence attributable to the plaintiff[s] and to the defendants.

N.T Trial, 11/18/10 (A.M.), at 63, 73-74, 76-77 (emphasis added).

When it gave its supplemental charge in response to Attorney Stitcher's closing argument, the trial court expressly directed the jury that it was to be considered in *addition* to these earlier instructions; thus, the supplemental charge must be viewed in conjunction with those instructions, not divorced therefrom and in isolation. Cooper, supra; Reilly, supra. As a result, the supplemental charge, when viewed in its proper context, was an integrated part of the trial court's overall instructions properly apportioning the burden of proof between the parties and ensuring that the jury's

findings would be based on the evidence of record properly before it.[26]  The Superior Court, therefore, was in error to disturb the trial court's ruling, and we reverse this aspect of its decision as well.

## IV. Conclusion

We conclude that the trial court did not abuse its discretion in barring the tolling agreement between the Poletts and Dr. Booth from being admitted into evidence.  We also find that the trial court did not abuse its discretion in permitting Dr. Booth to provide expert testimony under Pa.R.Civ.P. 4003.5.  Lastly, we determine that the trial court did not err in giving its supplemental "no speculation" instruction to the jury.  Consequently, we reverse the order of the Superior Court and remand this matter to the Superior Court so that it can consider the question of whether the trial court properly denied Appellees' motion for remittitur of the verdict.

Order reversed.  Case remanded.  Jurisdiction relinquished.

Former Chief Justice Castille and former Justice McCaffery did not participate in the decision of this case.

Messrs. Justice Baer and Stevens join the opinion.

Mr. Justice Eakin files a dissenting opinion in which Mr. Chief Justice Saylor joins.

---

[26] We disagree with Appellees' suggestion that they were prejudiced by the trial court's supplemental charge because it restricted the jury's consideration of alternative causes of Mrs. Polett's injuries other than the bicycle ride.  It seems evident that the jury understood from the trial court's overall charge that they could find causes of Mrs. Polett's injuries other than the bicycle ride, so long as such findings were supported by expert testimony, as they did, in fact, find that Mrs. Polett was 30 percent negligent in causing her injuries.